Swigert, &c.
*vs*
Graham.

</div>

---

<div style="text-align:right">

7bm661.
115   586

</div>

## Swigert, &c. *vs* Graham.

### Error to the Franklin Circuit.

*Case. Bailments. Actions ex delicto and ex contractu. Parties. Instructions. New trial.*

<div style="text-align:right">

Case.

Case 158.

</div>

Chief Justice Marshall delivered the opinion of the Court.

<div style="text-align:right">October 7.</div>

This action on the case was brought by Graham against the owners of the steam boat Oliver Anderson, to recover for the loss of Edmund, the plaintiff's slave, who while employed as a hand, hired for the service of the boat, was drowned in the Kentucky river, in August, 1844. The declaration avers that Edmund was employed on the boat for hire to be paid to the plaintiff; that the captain, officers and agents of the defendants having the management of the boat, and the direction of Edmund, &c., not regarding their duty in that behalf, took so little and such bad care of the boat that it was run aground, and that they took so little and such bad care of Edmund, &c., that owing to their carelessness, negligence, unskilfulness, misdirection and mismanagement of said boy Edmund, &c., he was drowned.

<div style="text-align:right">Case stated.</div>

1. It seems that one of the owners of the boat was not joined in the action, and that one of the defendants was not an owner. And the first of these facts having been pleaded in abatement, and a demurrer to the plea sustained, the first question is, whether the action was subject to be affected by the nonjoinder alledged. It is doubtless true that the mere circumstance of the action being in form "*ex delicto*," should not conclusively relieve it from those rules with regard to the consequences of nonjoinder or misjoinder of parties, which apply peculiarly to actions in form "*ex contractu*," and do not in general apply to those of the other class. The grounds

<div style="text-align:right">

Where an action is not brought for the mere non-feasance of a contract, but for tortuous negligence or mismanagement, or the exercise of rights and duties belonging to the relation which arises out of the contract, a nonjoinder of part of the contracting parties, or the joinder of others, will not affect the right of recovery.

</div>

of discrimination between those cases in which these rules are, and those in which they are not applicable, are not however, so far as we have seen, precisely defined. But this action is clearly not brought for the mere nonfeasance of a contract; but for tortious negligence or mismanagement in the exercise of rights and duties belonging to the relation which is itself created by contract. The action is not brought for the non-delivery of the boy according to the terms, express or implied, on which he was hired, but for the breach of a duty imposed by law upon a party who has the possession and use of the slave of another, whether on hire or not. And although the declaration would not in this case be sustained, unless there were evidence that the boy Edmund was in the service of the boat on hire, it is not necessary to prove any stipulation of that contract, and therefore it is not, in view of the question now on hand, necessary to prove the contract. The action on the case for a breach of warranty on a sale, put by *Chitty*, 1 *vol.* 74, as an example of a case in which as a contract is to be proved, the rules applicable to actions *ex contractu* should apply, is not analagous to the present case. In the action for a breach of warranty, whether in case or assumpsit, the action is essentially for the nonfeasance of the contract, and for nothing else. We are not satisfied that the present case should form an exception to the general rule which prevails in actions in form *ex delicto*, and are therefore of opinion that the plaintiff's right of recovery in this suit, should not be affected by the alledged nonjoinder or misjoinder of parties defendants.

2. The material question in the case is, whether under the actual circumstances, the owners of the boat are liable for the loss of the slave, by being drowned while in their employ. And this question depends not merely upon the general principles applicable to the case of bailment on hire, as they are stated or adjudged in relation to inanimate or to mere animal property, but upon the proper application or modification of those principles in reference to the particular case of a slave hired for service as a common hand on board of a steam boat engaged in the navigation of the Kentucky and Ohio rivers. The

The bailee of a slave for hire is bound to ordinary diligence in regard to the health, safety, &c. of the slave, and responsible for ordinary neglect, as in all cases of bailment for hire.

rule that the bailee on hire, is bound to ordinary diligence, and responsible for ordinary neglect, is doubtless true in all cases of their bailment, unless there be fraud or a special contract by which it may be varied in the particular case.

But what is or is not ordinary diligence may vary, not only with the circumstances under which the subject of it may be placed, but with the nature of the subject itself. That which in respect to one species of property might be gross neglect, might in respect to another species be extraordinary care. And under peculiar circumstances of danger, extraordinary exertions may be required of one who is bound only to ordinary diligence, or in other words, the circumstances may be such, that extraordinary exertions are nothing more than ordinary diligence.

*But what is ordinary care, or care in regard to one species of property, may not be so in regard to other property; it may vary on account of the subject itself, or on account of the circumstances in which it is placed.*

Ordinary diligence, then, means that degree of care, or attention, or exertion, which under the actual circumstances, a man of ordinary prudence and discretion would use in reference to the particular thing were it his own property, or in doing the particular thing were it his own concern. And where skill is required for the undertaking, ordinary diligence implies the possession and use of competent skill. On the other hand, the same principles which impose on the bailee these obligations, impose on the bailor, (in the absence of special contract or representation,) the corresponding obligation that the thing or property hired for use shall be reasonably fit for the purpose, or capable of the use known to be intended: that is, that it possesses the qualities usually belonging to things of that kind when used for the same purpose.

*Ordinary diligence means that degree of care or attention, or exertion which under the actual circumstances a man of ordinary prudence and discretion would exercise in reference to the particular thing were it his own property.*

And of course the bailment of property on hire for a particular use or service, implies the right on the part of the bailee to use it in that service in the ordinary way, unless at some particular period or part of the service, there should be special circumstances rendering such use improper, and which are, or ought to be known to him. Having a right to rely upon its possession of the qualities ordinarily belonging to similar things used in similar service, he is bound to bestow only that degree of care, attention or exertion for the preservation of the thing

*—So there is a corresponding obligation on the bailor who knows the use for which property is bailed that it is capable of the use for which it is hired; and implies a right to use it in that service in the ordinary way, unless there should be some special*

SWIGERT, &C.
*vs*
GRAHAM.

reason at some particular time known to bailee why it should not be so used.

A slave being capable of voluntary motion, of observation, experience, knowledge and skill, is presumed in ordinary cases, to be capable of taking care of himself if disposed to do so, without constant supervision or physical control.

which is ordinarily bestowed for the preservation of things of that kind in that service. .

Applying these principles to the case of a slave hired either for general or special service, we come at once to the conclusion, that being ordinarily capable, not only of voluntary motion by which he performs various services, but also of observation, experience, knowledge and skill, and being in a plain case at least, as capable of taking care of his own safety as the hirer or owner himself, and presumably, as much disposed to do it, from his possession of these qualities, with habits and disposition of obedience implied in his condition, and on which the hirer has a right to rely, he may be expected to understand and perform many, and indeed most of his duties by order or direction more or less general, without constant supervision or physical control, and may be relied on, unless under extraordinary circumstances, for taking care of his own safety without particular instructions on that subject, and *a fortiori*, without being watched, or followed, or led to keep him from running unnecessarily into danger.

The hirer of a slave should not expose him to extraordinary hazard without necessity, and when necessary, that such caution should be used as a man of ordinary prudence would use in regard to his own slave, and this to be regulated by intelligence of the slave.

What sort of care or diligence then, is the hirer to use for the safety or preservation of the hired slave? Omitting to notice what may be necessary to his health and comfort, we should say that he ought not, by his orders, to expose him to extraordinary hazard, without necessity, though they be incident to the nature of the service; and that when he does expose him to such hazards, necessarily or properly, he should use such precautions, by instructions or otherwise, as the circumstances seem to require, and as a man of ordinary prudence would use in so exposing his own slave. It might be necessary in sending him to the bottom of a deep well or to the eave of a steep roof, to tie a rope around his waist. But if he were possessed of ordinary intelligence, it could not be required that in sending him across a wide bridge, he should even be cautioned not to jump or fall from it. Nor if there were a ford as well as a bridge crossing the river, both ordinarily safe, and with each of which the slave was well acquainted, would it be deemed necessary to direct him to take the one and avoid the other, unless

there were some circumstances known or apprehended at the time, changing the usual condition of one or the other. Certainly it would not be necessary, when there was on the road which he was accustomed to travel, a ford to be crossed with which he was well acquainted, to tell him either not to go out of the usual track into the deep water, or not to take another road which he was not accustomed to travel, and which passed the river at a more dangerous place.

In the navigation of our rivers by steam boats, it might become necessary, in a particular case, that some one on board should swim to the shore with a line, though the attempt might be attended with great danger. This, though incident to the navigation, would be an extraordinary hazard, and doubtless it should not be ordered nor even permitted to be incurred without the use of such precautions within the power of the Captain or other officer, as experience might indicate for the occasion. But when the boat is aground on a bar or shoal, where the water on each side, and to the shore on each side, is not more than three feet deep, it could not be deemed necessary, in ordering a particular individual to go to the shore through the water, to do more, even if he were unacquainted with the bar, and could not see it plainly, than to point out its extent or the direction which he must take to the shore, or to advise caution in his proceeding, or to give such instruction as was necessary. But if he were well acquainted with the bar, or it were plainly visible through the water, and were, moreover, wide and safe, the direction to go to the shore would of itself be sufficient. It might be ordinarily assumed that the individual, whether white or black, slave or freeman, if he had common sense, would not go from the bar into the deep water, and the person giving the order would not be bound to anticipate such a deviation, and either to forbid it or in any manner to guard against it, but might pursue his own employment. Nor do we suppose that, if he knew the individual to be a swimmer, and saw that he was purposely deviating from the bar, with the view of swimming a few yards to the shore, he would be bound to order him back, or to caution him against it, unless

SWIGERT, &C.
*vs*
GRAHAM.

from the temperature of the water or some other fact, he had reason to apprehend danger. The direction to go to shore on such an occasion, implies, without more said, that he should go by the known and safe way. It is only when, from the uncertainty or difficulty of the way, or from some other circumstance, there may be danger in executing the order given, that it is necessary, in the exercise of ordinary care or diligence, to accompany it with any other words or acts than such as are essential to make it intelligible and practicable. •

The facts in this case which show how Edmund was drowned.

In this case the boat being on her downward trip from Frankfort to Louisville, had been aground in the deepest water, on a bar such as has been described, for about twenty four hours before the boy Edmund was drowned. She had been aground repeatedly before, on the same bar, and the crew, including Edmund, were familiar with the bar, which was besides, plainly visible from the boat. On this occasion two flats had been obtained from the shore, in which the freight, passengers, baggage and even the wood had been taken in repeated trips, from the steam boat to the shore. The water being warm and shallow, the hands employed in crossing the flats to and from the steam boat, had frequently gone through the water, pushing the boat; one of these flats having in it the wood of the steam boat, had been made fast to the shore a short distance below the bar, and there was deep water between them. On the second day it being deemed advisable to raise the ʃsteam in aid of the capstan, for the purpose of getting the steam boat ahead, an order was given, probably by the Captain, that the hands should go to shore and bring the boat with the wood. Several of the crew, with Edmund among them, got from the side of the boat on the bar, and went off, as some of the witnesses say, playing. But soon after an alarm was given, and they, or three of them were seen in the deep water, not far from shore, between the bar and the flat boat. Edmund was nearest the shore, and as some of the witnesses say, safe in water not waist deep, when the alarm was made on account of the other two, and a cry from some one on the boat for Edmund to save one of them by name. On this he seems to have turned back

and was drowned, while the other two were saved by taking hold of the hauser, which had been extended to the shore for hauling off the steam boat, and was lowered at the moment so as to be within their reach.

Upon the foregoing facts, except as to the question whether Edmund had reached a place of safety before he was drowned, there is no discrepancy in the evidence; and the clear preponderance of the testimony in opposition to that of a single witness, which on the last trial was quite indecisive, is that Edmund was a good swimmer, that the order to go on shore was not addressed to him more than others, nor objected to by him; that it was given in the usual way, without anger or confusion, and was obeyed by Edmund and others with alacrity. It is also clearly proved that it was a part of the duty of deck hands and firemen, of which Edmund was one, to go into the water if necessary, for the purpose of getting the boat off when grounded. And that there was a broad and safe way on the bar, from the boat to the shore, with which Edmund and the others were familiar. He having gone repeatedly from the boat to the shore on each side. It was proved by the pilot that he knew that the boat drew more water than the depth of water on the bar, and it appears that on that trip she was without a yawl or skiff. The first of these circumstances was, perhaps, referred to in the declaration, in making the charge of improper management of the boat, in running her aground, and both of them may have been referred to in the instruction given for the plaintiff, which, though somewhat ambiguous, may be, and probably was, understood as bringing the want of proper care in the management of the boat, to bear upon the question of liability in this case. But there is not only no evidence upon the question whether it was proper or improper to attempt to force a passage over the bar under the circumstances mentioned, but if it were shown to have been improper, the fact would form no ground of liability in the present case, any more than if Edmund had voluntarily got off of the boat unperceived in the night, and walking from the bar had drowned himself in the deep water.

SWIGERT, &c.
vs
GRAHAM.

One act of mismanagement in the navigation of a steam boat, not immediately connected with the loss of a hired slave, cannot be made the ground of recovery for the loss of such slave.

The grounding of the boat, if the result of "little or bad care," or imprudent management on the part of the officers and agents of the defendants, is too remotely, if at all, connected with the drowning of Edmund by going off of the bar on the next day, to make the defendants liable for the latter act, because the former was done by their agents. Edmund was not drowned by the attempt to pass the bar with the boat, nor by the failure of that attempt, but by leaving the bar instead of passing on it in going from the boat to the shore. Nor can the drowning of Edmund be referred to the want of a yawl or skiff. The mere possibility that if one had been there it would have been used on this particular trip to the shore, is no ground for attributing his death to the want of it. In truth there was as little danger in walking on the bar as in going in the yawl. If there had been a yawl and they had gone in it directly towards the flat boat, and Edmund had jumped or fallen out of it and been drowned, it would have been just as reasonable to attribute his death to going in the yawl, as to attribute it now to the want of a yawl. The absence of the yawl during one trip on the narrow waters between Frankfort and Louisville, could not render the owners of the boat liable for every accident that might possibly not have happened if there had been a yawl, any more than the grounding of the boat could render them liable for every accident that might happen while she was aground, because such accident possibly might not have happened if she had stopped at the head of the bar or returned to Frankfort.

—And a reference to such act of mismanagement in an instruction given to the jury, was calculated to mislead the jury.

The apparent reference to the responsibility of the defendants for a mismanagement of the boat, probably tended to mislead, or at least to confuse the jury, by directing their attention to the enquiry whether it was right or wrong to attempt to pass the bar, or to have made the trip without a yawl. The defendants were not responsible to the plaintiff for the boat or its management, but for Edmund and his management. The sole question was, whether through their agents they had so acted with reference to the boy Edmund, and with reference especially to his going to the shore on the particular occasion, as to make them liable for his being drowned in his at-

tempt to go to shore under the order given. The same instruction, after declaring that if Edmund was drowned while in the employment of the defendants, in and on the boat, they as the owners of the boat, are responsible for ordinary neglect or want of care or imprudent management, proceeds to say, "and if they (the jury,) believe that the Captain and officers of said boat did not use ordinary care and good management of said boy, Edmund, in consequence of which he was drowned, they ought to find for the plaintiff," &c. This instruction did not, perhaps, present any definite idea to the jury by the phrase "ordinary care." But it required not only ordinary care of Edmund, but also good management of him, to save the defendants from liability. Good management in addition to ordinary care, the law does not require. And although the two phrases may, perhaps, have been intended to mean the same thing, the latter was probably understood as adding something to the effect of the former.

Taking the whole instruction together, the jury may have supposed, and probably did infer that the question of ordinary neglect in the management of the boat, as well as the care of Edmund, was before them, and that if they believed that the boat was improperly run upon the bar, or improperly navigated without a yawl, and that if this had not been done Edmund would not have been drowned, the defendants as owners were liable. And from the latter part of the instruction, they may have inferred that something more than ordinary care, viz: good management of Edmund was required. If this erroneous tendency of the instruction were clearly and certainly obviated by any other instruction given on the trial, and if some definite idea of what the duty of ordinary care or diligence in regard to Edmund, required or meant in reference to the particular circumstances had been conveyed to the jury, the error which we have noticed might not have been prejudicial, and the verdict might have been different. But although several of the instructions given, on motion of the defendants, lay down the law of the case correctly, it is done by the use of general terms, which do not supply the defect, nor even the error of

*An instruction which required the jury to infer good management of the boat, as well as ordinary care of the slave, was misleading, as the two were not at all connected.*

that which had been given for the plaintiff. And the definition of ordinary care, given in one of these instructions, seems itself to refer rather to the management of the boat than of Edmund. Two of the instructions asked for by the defendants seem to have been properly designed, and although not entirely accurate, the overruling of them without giving others of similar effect, probably tended to confirm the inference from the instruction given for the plaintiff.

The first of these instructions is to the effect that if Edmund was one of the crew, and lost his life in the discharge of the usual service or employment of a hand on the boat, the defendants are not liable. But the particular service in which one of the crew loses his life, may be one of extraordinary hazard, though coming by usage within the range of his duties as a hand. And if so, the mere fact of its being in this sense the usual service of a hand, would not be conclusive, as already shown. The Court might perhaps have assumed that there was no extraordinary hazard in the particular service, and no circumstance which should have prevented Edmund being ordered to it. But we cannot say the Judge was bound to give an instruction which was based upon such an assumption. And yet the refusal to give it in a case where there was no doubt as to the fact, might lead the jury to suppose that although Edmund lost his life in a service appropriate to his station, and not attended with hazard, the defendants were liable.

The other instruction referred to is, "that the hirer of a slave is not bound by law in giving his orders to the slave to perform the labor he is engaged to perform, to go further than to give the orders in the usual way. He is not bound to follow the slave to see that the order is executed either with prudence or diligence by the slave." If the first clause of this instruction had been qualified by adding as a condition, "unless there be some peculiar circumstance known to him requiring caution in the particular case," we think the whole would have been free from objection. But the same observations apply to this as to the other instruction just stated, and we cannot say

the refusal to give it as asked was erroneous, though it may have tended to mislead the jury.

The instruction,.that if Edmund had reached a place of safety, and was drowned in consequence of turning back to rescue another, the defendants were not liable, was correct. As to the residue of the case as now appearing, we think it is covered by the following proposition: That if in the condition in which the boat was, it was proper to send the hands to the shore for the flat boat, though they might have to go through the water, and if Edmund, in the station in which he was employed was liable to perform that duty with others, and if with his knowledge of the bar, the order to go to shore and bring the flat, as given and understood, could have been executed by him so far as he was concerned, with the effect intended, and without hazard. and if there was nothing in his situation known to the officer who ordered or permitted Edmund to go which required that he should be excepted from the order or prohibited from going; and if his death was occasioned by his departing from the bar into the deep water of his own choice, without the orders of the defendants' agents who were entitled to control him, the defendants are not liable for the loss, unless their said agents knew of such departure from the bar in time to have prevented it, and had reason to believe that it was attended with extraordinary hazard to Edmund from want of skill in swimming or the like personal cause, and might have prevented it, but did not; or unless, after they were actually apprised that he was drowning, they might have saved him, but did not use the means within their power for that purpose.

In our view of the instructions, they do not place the liability of the defendants upon these nor upon proper grounds, and therefore we cannot say that the verdict establishes the facts on which the plaintiff's right of recovery depends. Wherefore, without deciding whether the evidence would have authorized the finding of those facts, and being satisfied that there was no error in granting the new trial after the first verdict, and that the opinions of the Court giving and refusing instructions on the last trial were misleading in their tendency, the judg-

ment is reversed, and the cause remanded for a new trial in conformity with the principles of this opinion.

*Cates & Lindsey and Harlan & Craddock* for plaintiffs; *Hewitt and Morehead & Reed* for defendant.