Hemphill, Ch. J.
Prom the general terms in which the first assignment is expressed, it might be inferred that all the pleas of the plaintiff's in error Iliad been stricken out. But the record shows that the only averment of de- *284 fondants stricken out or to which exception was sustained is that which alleges (he contract of hire to have been in writing, and that such contract had been, at the time of hiring, delivered to tlie plaintiff in tlie action. If this general assignment be intended to refer to the ruling of tlie court in this particular, we are of opinion that it is not well taken. It does not appear to be of material consequence whether such averment formed a part of the answer or not. Tlie fact whether (.lie contract be in writing or not would intrinsically be an immaterial issue; and on that ground the allegation was properly excluded. But that would not affect the right of the defendants to prove tlie contract to have been reduced to writing or to establish its contents. The plaintiff liad not averred that the contract was verbal, and it was in his power to have introduced any proof, verbal or written, to have substantiated the allegations of the petition. But if id had appeared in the course of the trial, by the evidence of either party, that the contract had been in writing, and that the same had beeu delivered to the plaintiff, and there was a conflict in the testimony as to the terms of such contract, the defendants might have insisted on tlie production of the written evidence or some account of its loss or destruction. It would then have been material to their defense, and would have constituted the most authentic evidence of its contents and of the terms of the contract between the parties. There is but one witness, however, who testifies that the contract was in writing, but he states that he did not read it, nor is there any evidence that he heard it read. This would not have beeu of itself sufficient to have'justified any motion founded on the 11011-production of tlie written document, or for instructions to the jury that they must exclude from their consideration the parol testimony as to the stipulations of the agreement. And at all events, whether it were sufficient or not, no such motion was made, and no such instruction was asked; and the defendants cannot now, in this court, claim the reversal of the judgment on the ground that the contract was in writing or that the averment to that effect was stricken out of tlie pleadings.
The second error assigned is in overruling tlio exceptions of the defendants.
In answer to this, it will be sufficient to state tiiat the facts alleged in tlie petition, if proven, would entitle the plaintiff' to recover; and there is no error in overruling- the exception to its legal sufficiency.
Th.e third assignment of error, viz, in charging- against. law, and the fourth, in refusing to charge the law, are too vague and general to require of the court to examine the record to ascertain what was charged and what refused, and to inspect minutely all the rulings of the court to detect some lurking error that might, perhaps, on such exploration be brought to light; and, in fact, all the assignments, except the fifth, aro objectionable fronCtho indefinite generality of their terms. But they are not more so in this case than in many others; and perhaps some excuse maybe found for assignments of this character in the hurried manner in which, from necessily, they must frequently be made. But the appellee and the court ought always to be. apprised of the points which will be insisted upon by the appellant. It is due to tlie attorneys who have tiled their assignment to say that in (his as well as in all their eases their briefs are filed for a greater or less period before the trial of the cases; and that, consequently, the opposing partios are informed of the special grounds on which they will insist. But in this case tlie record does not show what charges were given or refused by the judge; consequently, there is nothing presented for revision under said assignments.
The. fifth alleged error is tlie refusal to grant a new trial. Tlie motion is predicated oil several grounds. The fourth'and fifth, impugning tlie. verdict as being contrary to law and evidence, only require consideration ; and tlie argument of tlie appellants is confined to these, in effect.
The plaintiff, in the petition, alleged that iic had hired the slave Bill to the defendants as an axe hand, and on tlie agreement that lie was to be employed in cutting timber necessary to carry on the said steam-mill business, and not as a hand to be employed about the machinery; but that tlie defendants had, without authority from tlie plaintiff, caused tlie said slave to assist in. *285 putting the machinery in motion, by putting his shoulder to the fly wheel, and negligently caused and permitted him to remain in this dangerous position and in contact with the machinery while the same was being put in motion by steam, by-which tlie slave received an injury terminating in death; and -also, that his death resulted from the want of due diligence and care on the part of the defendants.
On such allegations the plaintiff attempted proof, that by the terms of the • contract the slave ivas not to be employed in assisting in tlie mamagement of the machinery; and consequently, that bis death was the inevitable result of his •employment in a service which he was not hired to perform; and also, that his death resulted from the negligence of the defendants, in not taking the proper precautions to secure the life of tlie slave against the danger to which lie was exposed. Rebutting evidence was introduced by the defendants. There was .a conflict of testimony, especially upon tlie first point; and the rule is well settled that where there is such conflict, where it does not clearly appear that the verdict is wrong — as that it is without or against testimony — no new trial •can he granted. (Briscoe v. Bronaugh, 1 Tex. R., 340.) From the facts, as they appear in the statement, I incline to the opinion that the conclusion drawn by the jury was erroneous; but this is not so manifest as to authorize their verdict to be disturbed. The testimony of tlie witness Morgan is distinct, that Mr. Smith ivas informed that the boy was a good axe hand, and that lie (Smith) agreed to hire the boy as an axe baud until the end of the year. Young Chance testifies that ho was not the agent to hire the boy; and that he did not inform Mr. Smith that ho wished the boy worked in the mill; nor did Mr. Smith say that he would work the boy where it suited him best. The testimony of young Chance is, in this particular, expressly contradicted by another witness; and, in opposition to the testimony of Morgan, it is proven by John G. Smith, Chat when Morgan said tlie boy was a good chopper, E. M. Smith replied, that if he suited best as a chopper lie would put him in the woods; if not, he would put him in the mill or wherever lie suited him. The .jury were tlie judges of the credit to be attached to these statements; and il the legal effect of tlie plaintiff’s testimony warranted a verdict in his favor, they could so find, notwithstanding tlie contradictory evidence of defendants. That tlie testimony of Morgan would, in law, sustain the verdict, is clear. He testifies that the slave was hired as an axe hand. It is true that the prima facie presumptiou would be, that a slave hired to assist in carrying on the business of a steam mill might be employed in any of tlie ordinary duties or services necessary to tlie successful operation of said mill; and this would be the case unless there was an express agreement to the contrary, or unless he were hired to perform some particular service. But if the bailment were for a particular purpose, if the negro, as in this case, were hired to perform the duties of axe band alone, then it is very clear that the defendants, by employing tlie property otherwise than as stipulated, are in law responsible for his loss, irrespective of the fact of whether they exercised due care and attention •or not. Tlie law presumes that the loss happened from the misuser of the property. It is said by jurists, and in adjudged cases, that there is, on the part of the hirer, an implied obligation not to apply tlie thing hired to any ■other use than that for which it is hired. If a horse be hired as a saddle horse, the hirer has no right to use him as a cart horse or as a beast of burden ; and if the thing is used for a different purpose, or in a different manner or for a longer period than that intended by the parties, the hirer is not only responsible lor all damages, hut if a loss occurs, though hy an inevitable casualty, lie will he responsible therefor. (Jones on Bailm., 68, 69, 121; 2 Ld. Raym., 915; Story on Bailm., sec. 413; 5 Mass. R., 104; 1 Const. R., So. Ca., 121; 1 Rice R., 182; 3 Smedes & Marsh. R., 129; 2 Rich. R., 613; 8 Humph. R., 413; 6 Ga. R., 218.) The wrong consists in the violation of the contract of bailment; and if a loss occur, the measure of damages for such wrong is the value ■of the slave or thing bailed.
Another point at issue was, whether the loss of the slave was attributable to *286 the default or negligence of the defendants. At one period in the common law there was a difference, of opinion as to the degree of care and diligence tO' be exercised by the hire)- for the preservation of the property. In the case of Coggs v. Bernard, (2 Ld. Raym. R., 909, 916,) it was held by Lord Holt that the hirer was bound to the utmost diligence which the most diligent father of a. family uses. This was controverted by Sir William Jones, in his treatise on Bailments, who contended that, as the contract of hiring was one of mutual benefit, the hirer was bound only to ordinary diligence, and responsible, consequently, only for ordinary negligence; that he was required only to exercise the care which prudent meii, that is, the generality of mankind, exercised in keeping their own goods, (Jones on Bailm., 88; Story on Bailm., sec. oOS;) and this is now well settled to be the true exposition of the law. (Mims v. Mitchell, 1 Tex. R.) This doctrine is applicable as.well to bailment on hire of slaves as of inanimate or mere animal property. The degree of care and diligence varies according to the species of property over which it is to be exercised; but in all cases it must be the same which a person of ordinary prudence or discretion would exercise in relation to the particular tiling were it his own property. A slave is a rational being, capable, in ordinary cases at least, of taking care of himself, and may be expected to perform most of bis duties without constant supervision and control, or without (he necessity of being constantly watched or followed to keep him from running unnecessarily into danger. But lie ought not to be exposed to extraordinary hazard, although incident to the service, without necessity, and without such precautions, by instructions or otherwise, as circumstances may require, and as a man of ordinary .prudence would use, in exposing bis own slave to the same danger. And the bailor is under the corresponding obligation (which may be waived by special contract or notice) that the property hired shall be reasonably fit for the uses or purposes known to be intended. This subject is well discussed in Swigert et al. v. Graham, (7 B. Mon., 664,) and some of f he conclusions here stated are there elaborated and explained. If the issue between the parties was that of negligence alone, it appears that, if the verdict was tested by these principles, it couid uot be sustained. It is true that Morgan states that Smith admitted, in conversation, the deatli to have partly resulted from the carelessness of the engineer Banton. But the testimony is full as to the great degree of prudence and care exercised by E. M. Smith ; and that the boy bad been frequently warned by himself and others in his employment against the danger of carelessly going about the machinery, and that he was cautioned by Smith in tiie particular instance. If negligence, on the evidence, was attributable at all to the defendants, it was in not placing- banisters on each side of the wheel. This would render it, doubtless, more secure; but there is no evidence that any such precautions are usually taken by the owners of mills; in fact, all the evidence is to the contrary. Whether the defendants would or would not he liable for the want of this precaution, it would certainly be advisable, particularly where slaves are employed, that such safeguards should he used.
Note 79. — Smith v. Tooke, 20 T., 750.
Note 80. — Mills v. Ashe, 16 T., 295; Willis u. Harris, 26 T., 186.
Note 81. — Mitchell v. Mims, 8 T., 6; Mills v. Ashe, 16 T., 295; Robinson v. Varnell, 16 T., 382.
I do not deem it necessary to examine the cases in which it is held that the owner, having a clear knowledge of the defects or dangers of the machinery, or service to which he hires his slave, assumes the risk of accidents or injuries-occurring therefrom, (4 Port. B., 234;) and a further investigation of the rules on the subject of the care and attention to be exercised by the bailee becomes unnecessary, as, from the conflict of testimony on the first point at issue between the parties, the verdict must necessarily be sustained.
Judgment affirmed.