PRODUCERS GRAIN CORPORATION,
Appellant,

v.

A. J. LINDSAY, Appellee.

No. 9146.

Court of Civil Appeals of Texas,
Amarillo.

July 23, 1980.

Underwood, Wilson, Sutton, Berry, Stein & Johnson, Edward H. Hill and Don M. Dean, Amarillo, for appellant.

Crenshaw, Dupree & Milam, Max C. Addison, Lubbock, for appellee.

DODSON, Justice.

In the venue phase of this action, Producers Grain Corporation appeals from an order by the trial court overruling its plea of privilege. We affirm.

A. J. Lindsay instituted this action in Hale County, Texas, against Producers Grain Corporation. In this action, Mr. Lindsay seeks to recover damages from Producers Grain Corporation for its alleged breach of a cattle feeding agreement with Mr. Lindsay through its failure to properly feed, fatten, care for and maintain his cattle. In the alternative, Mr. Lindsay seeks damages for the negligence of Producers Grain Corporation and for its material misrepresentations to plaintiff, *inter alia*, as to the feeding and rations or mixtures of feed given to the cattle, as to the cost of feeding, and as to the manner of placing and handling the cattle. Producers Grain Corporation, a Texas corporation, filed its plea of privilege to be sued in Potter County, Texas, site of its principal office. In his controverting plea, Mr. Lindsay asserts venue in Hale County, Texas, under subdivisions 7, 9a and 23 of article 1995 of the Texas Revised Civil Statutes Annotated (Vernon 1964 & Vernon Supp. 1980).

■ Findings of fact and conclusion of law were not and need not be filed in this venue phase of the case. *See* Tex.R.Civ.P. 385(e). Thus, on appeal we must resolve every reasonable intendment in favor of the trial court's order overruling the plea of privilege. *James v. Drye*, 159 Tex. 321, 320 S.W.2d 319, 323 (1959).

The trial court sustained venue in Hale County under subdivisions 9a and 23 of article 1995. Subdivision 23 provides in part as follows:

> *Suits against a private corporation*, association, or joint stock company *may be brought* in the county in which its principal office is situated; *or in the county in which the cause of action or part thereof arose*; (emphasis added).

In his original petition which is attached and made a part of his controverting plea, Mr. Lindsay alleges, *inter alia*, a cause of action for breach of a feeding agreement and a cause of action for negligence. Thus, to sustain venue under subdivision 23 on his contractual theory of recovery, Mr. Lindsay must prove that a contractual duty was owed to him by Producers Grain and that such duty was breached which caused damages to him. *See Employers Casualty Co. v. Clark*, 491 S.W.2d 661, 662 (Tex. 1973); *Alsup v. Pickens*, 526 S.W.2d 266, 267 (Tex.Civ. App.—Houston [1st Dist.] 1975, no writ).

■ Producers Grain Corporation brings three points of error. By its first point, appellant contends the trial court erred in overruling its plea of privilege based on subdivision 23 because there is no evidence that Producers Grain breached any duty owed to Mr. Lindsay giving rise to a cause of action or part thereof in Hale County. In support of its position, the appellant argues that the contract between the parties "did not impose on the defendant any obligation or duty to feed plaintiff's cattle any special or particular feed or ration or to fatten the cattle to marketable condition within any particular period of time." In deciding this legal sufficiency challenge, we must consider only the evidence and the inferences tending to support the trial court's judgment and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

■ It is uncontroverted that there is no expressed written contract between the parties. Nevertheless, a contract implied in fact may be inferred from the attending circumstances surrounding the transaction. *See Haws & Garrett General Contractors, Inc. v. Gorbett Brothers Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972); *Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 574–75 (Tex.Com. App. 1928, judgt. adopted). As stated by the court in *Allen-Morrow Co. v. Liquid Carbonic Co.*, 27 S.W.2d 132, 135 (Tex.Com. App. 1930, judgt. adopted):

A contract implied in fact, or an implied contract in the proper sense, arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract.

*Accord, Marr-Piper Co. v. Bullis, supra,* at 575. Furthermore, it is generally a question for the trier of fact to determine if a contract implied in fact is established by the attending circumstances of the case. *See Haws & Garrett General Contractor, Inc. v. Gorbett Brothers Welding Co., supra,* at 610.

■ The evidence shows that Mr. Lindsay purchased 909 head of cattle ranging in average weight from 446 pounds to 835 pounds. Mr. Lindsay, who has been in the cattle business for forty-two years, shipped these cattle to Producers Grain Corporation's feedlot in Hale County, Texas, in July and August of 1974 for the purpose of feeding and fattening the cattle for market. Mr. Lindsay stated that the 400 pound weights had "a little more age than what they actually weighed," but Producers Grain accepted the cattle for feeding and did not say anything about not being able to feed out the cattle.

Grover Phillips, manager of the Producers Grain feedlot in Hale County, Texas, testified that he made the arrangements with Mr. Lindsay for the cattle to be fed at the feedlot. As to his understanding of the transaction, Mr. Phillips' testimony was as follows:

Q. And what was the understanding as to how they would be fed?

A. They would be fed in the same manner as any other customer's cattle that was being fed there at that time.

Q. Was there anything concerning the feeding of the cattle that they'd be fed in the good and proper and customary manner of cattle feeding operations in feeding out cattle?

A. Yes, sir, they'd be fed in the manner that all feed yards feed cattle.

Mr. Phillips' testimony further shows that Producers Grain's staff nutritionists determined the type of rations to be fed to the cattle. Normally, cattle were fed a starter ration, a grower ration, an intermediate ration and a finisher ration. The principal component of these rations was milo grain. Approximately 95 percent of the grain fed in the cattle operation, came from Producers Grain Corporation's grain operation. In its cattle feeding operation, Producers Grain generally fed only no. 2 milo grain. Mr. Phillips stated that all of Producers Grain Corporation's grain contracts called for no. 2 milo and that although Mr. Lindsay was billed and paid for no. 2 milo, the cattle were fed some no. 2 milo but that a majority of the grain fed to the cattle was of a poorer quality, such as no. 4 milo or sample grade milo.

The record reflects that Mr. Lindsay visited the feedlot thirty to thirty-five days after the cattle were sent there and he testified that the cattle were as "good as could be expected." In February of 1975, however, Mr. Lindsay complained to Producers Grain about the condition of his cattle because they had not gained like they should have. After Mr. Lindsay complained, the cattle were put on a "good ration" and they all responded to the new feed in about ten days.

Mr. Phillips testified that Mr. Lindsay's cattle did not perform as well as they should have if they had been on no. 2 milo. Further statistics confirm his opinion. Three witnesses established that under normal circumstances it takes approximately 140–180 days to fatten the larger cattle and approximately 190 to 210 days to fatten the smaller ones. In order to be ready for market, however, Mr. Lindsay's cattle were in the feedlot an average of seventy-nine days longer than cattle normally have to stay to be "market fat." In this connection, Mr. Lindsay and Mr. Phillips each stated that the per day cost to feed each head of cattle was from $1.00 to $1.50. Furthermore, forty-four of the 909 cattle died or 4.84 percent, while the average death rate is normally two to two and one-half percent. The average cost per pound gained is nor-

mally forty cents but the average cost per pound gained for Mr. Lindsay's cattle was 63.12 cents or 23.12 cents more than it would normally cost. Also, the conversion rate, i. e. the number of pounds of feed it takes to make one pound of grain was 11.66 while on the average it is eight.

Thus, when we consider the evidence and the reasonable inferences therefrom in the light most favorable to support the trial court's judgment, we are persuaded that there is evidence of probative force from which the court could have found a contract implied in fact that Producers Grain tacitly agreed to feed Mr. Lindsay's cattle a ration consisting of no. 2 milo grain, and that Producers Grain's failure to feed such ration resulted in damages to Mr. Lindsay. Accordingly, we overrule Producers Grain's first point of error.

 In its second point of error, Producers Grain claims the judgment should be reversed because the evidence is legally insufficient to support the essential elements of Mr. Lindsay's negligence theory of recovery. It is well settled that actionable negligence consists of three essential elements. The elements are a legal duty owed by one person to another, a breach of that duty and damage proximately resulting from such breach. *See, e. g., Abalos v. Oil Development Co.*, 544 S.W.2d 627, 631 (Tex. 1976); *Coleman v. Hudson Gas and Oil Corp.*, 455 S.W.2d 701, 702 (Tex. 1970). Moreover, the existence of a legal duty under a given statement of facts and circumstances is essentially a question of law for the court. *See Abalos v. Oil Development Co., supra*, at 631; *Jackson v. Associated Developers of Lubbock*, 581 S.W.2d 208, 212 (Tex.Civ.App.—Amarillo 1979, writ ref'd n. r. e.); *Webb v. City of Lubbock*, 380 S.W.2d 135, 136 (Tex.Civ.App.—Amarillo 1964, writ ref'd n. r. e.).

 In this instance, there is evidence of probative force from which the trial court could find that Mr. Lindsay delivered his cattle to Producers Grain and Producers Grain accepted them for the purpose of caring for and fattening the cattle for mar-

ket, *i. e.*, to improve the cattle by exercising its cattle feeding and feedlot skill for compensation. In essence, Producers Grain hired out to exercise its cattle feeding and feedlot skills to improve Mr. Lindsay's cattle to a market fat condition. Under such circumstances, the transaction is a bailment for compensation for the mutual benefit of the parties. In such bailment, the law imposes on Producers Grain the legal duty to exercise ordinary care in carrying out the purpose of such bailment. *See, e. g., Sims & Smith v. Chance*, 7 Tex. 561, 571 (1852); *Western Woods Products Co. v. Bagley*, 274 S.W.2d 111, 112 (Tex.Civ.App.—Texarkana 1954, writ ref'd n. r. e.); 8 Am.Jur.2d *Bailments* § 220 (1963); 7 Tex.Jur.2d *Bailment* § 26 (rev. 1975).

We further conclude that there is probative evidence, in this instance, from which the trial court could find that Producers Grain breached its duty to exercise ordinary care in feeding and caring for the cattle, and that Mr. Lindsay sustained damages as a proximate cause of such breach. Accordingly, we overrule Producers Grain's second point.

In summary, we overrule Producers Grain Corporation's points one and two. Our disposition of these points is dispositive of this appeal. Accordingly, we affirm the judgment of the trial court.