677 So.2d 409 (1996)
AMWEST SURETY INSURANCE COMPANY, Appellant,
v.
ERNST & YOUNG, Etc., Appellee.
No. 95-2499.
District Court of Appeal of Florida, Fifth District.
August 2, 1996.
DeWitte Thompson, of Thompson & Slagle, P.C., Norcross, Georgia, for Appellant, Amwest Surety Insurance Company.
J. Andrew Heaton of Ernst & Young, Washington, D.C., and Gregory A. Presnell and Stacey C. Rosenthal, of Akerman, Senterfitt & Eidson, P.A., Orlando, for Appellee, Ernst & Young.
HARRIS, Judge.
The issue on appeal is whether the court erred in granting summary judgment in favor of an accounting firm based on the conclusion *410 that the plaintiff was not one of a "limited group" of persons the accounting firm knew would rely on the firm's work.
Amwest Surety Insurance Company (Amwest) sued Ernst & Young to recover alleged losses of over $2,300,000 which it sustained as a consequence of issuing seven payment and performance bonds for a company known as Lake Technologies, Inc. (Lake), as principal obligor in reliance on audited financial statements allegedly negligently prepared by Ernst & Young. Amwest claimed that the audit improperly failed to disclose a substantial debt Lake owed to the Internal Revenue Service.[1]
Ernst & Young filed a motion for summary judgment claiming that Amwest had not established that it was one of a "limited group of persons" for whose benefit Ernst & Young had supplied the audited financial statements or to whom Ernst & Young knew Lake intended to furnish the report.[2] Ernst & Young therefore claimed that it owed no duty to Lake and no cause of action should lie.
The evidence presented at the hearing on the motion for summary judgment showed that during the course of preparation of the audited financial statement, Lake's president, Thomas Duffey, and its internal accountant, Betty Irvine, were the individuals who primarily dealt with Ernst & Young. It is undisputed that, during the course of communications between Lake and Ernst & Young, Duffey sent Ernst & Young a letter dated January 6, 1989, the bulk of which is reproduced here:
I have heard rumors that our audited statement would not be complete and available for us until March, 1989. In all of the conversations that we have had with you and others in your organization, I think that you all realize the importance of our obtaining an audited statement as soon as possible. Some of the reasons causing this urgency [are] as follows:
* BONDING REQUIREMENTS
* BANKING REQUIREMENTS
* SOME OF OUR MAJOR SUPPLIER REQUIREMENTS
* STATE PREQUALIFICATION REQUIREMENTS
We have had a good year in 1988 but have had major cash flow problems. Some of our major suppliers are asking for an updated statement so that they can justify carrying our account past 90 days which helps our cash flow.
Our banking limit is set at a $450,000.00 line of credit and we can not expect any other consideration until the 1988 audited statement is completed and presented to them for review.
We are submitting our prequalifications to other states for review and they are requiring a current audited statement submitted with our other material. This is holding up our bidding on future projects. Our bonding line is extremely limited and very expensive. The bonding underwriters are requiring a current audited statement so that a line of bonding can be issued with reasonable rates and adequate limits.

I know that you are very busy people and handle a lot of accounts other [than] ours but we have a very urgent need for a current audited statement.
Please do all that you can to complete an audited statement for us as soon as possible, preferabl[y] the last of January or the first of February, 1989. (Emphasis added.)
In an affidavit filed in opposition to Ernst & Young's motion for summary judgment, Ms. Irvine stated that when Ernst & Young was retained, she provided the accounting firm with a list of the contracts which, as of early 1989, Lake had entered into or expected to enter into and which required the *411 issuance of appropriate payment and performance bonds. She further stated that she advised representatives of Ernst & Young that the specific projects listed required performance and material payment bonds in order for Lake to undertake performance of those projects. Finally, in her affidavit, Irvine averred that she advised Ernst & Young that audited financial statements were needed for the year ending December 31, 1988 in order for Lake to obtain future bonding, including but not limited to the projects and bonds listed in the summary she had provided.
Ernst & Young staff accountant Schandel admitted in his deposition, which was filed in support of summary judgment, that he was aware that one of the reasons Lake needed an audited financial statement was to obtain bonding. Additionally, the following statement appears in an Ernst & Young internal document entitled "Audit Planning Memorandum," which document was admitted as an exhibit at the summary judgment hearing: "The client has requested we work with them to complete the audit as quickly as possible as they need the audited financial statements for additional financing negotiations and contract bonding."
It is the position of Ernst & Young that because Lake identified so many possible uses for the audit in the Duffey letter, it might as well have provided no notice at all. Therefore, Ernst & Young maintains that the trial court correctly found that Amwest was merely one of a myriad of foreseeable users rather than a member of a limited group and thus could not seek redress against Ernst & Young. We disagree.
In First Florida Bank, N.A. v. Max Mitchell & Company, 558 So.2d 9 (Fla.1990), the court held that a third party, though not in privity with an accountant, could nonetheless assert a claim for negligence by the accountant in auditing a financial statement if certain conditions were satisfied. The court adopted the rule set forth in section 552 of the Restatement (Second) of Torts (1976), which outlines those conditions as follows:
(1) One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
(2) [T]he liability stated in Subsection (1) is limited to loss suffered
(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
The Max Mitchell court quoted comment (h) to section 552 to provide further explanation:
Under this Section ... it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of *412 action in reliance upon it, on the part of anyone to whom it may be repeated.
Max Mitchell, 558 So.2d at 15 (quoting comment (h) directed to subsection (2) of section 552 of the Restatement).
In the instant case, it seems clear that Lake identified several "limited groups" "for whose benefit and guidance" Ernst & Young knew Lake intended to supply the audited financial statement. In the Duffey letter, Lake expressly informed Ernst & Young that the need for the audited statement was urgent for four specific reasons, among others:
1. Some of Lake's suppliers wanted an updated statement so they could justify carrying Lake's account past 90 days;
2. Lake's bank would not extend its line of credit until the audited statement was submitted to the bank for review;
3. Other states required that a current audited statement be included with any bids Lake wished to submit;
4. Lake's bonding underwriters were requiring a current audited statement before issuing a line of bonding with reasonable rates and adequate limits. (emphasis added)
In addition, Ms. Irvine, stated in her affidavit that she advised Ernst & Young that audited financial statements were needed for the year ending December 31, 1988 in order for Lake to obtain future bonding for the projects and bonds listed in the summary she had provided as well as other future projects.
According to comment (h) of section 552, it is sufficient that the accountant supplies the information to his client for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the accountant may never have heard of the plaintiff by name. Again, in the instant case, based on the Duffey letter and the Irvine affidavit, Amwest clearly met its burden in establishing that Ernst & Young supplied the audited financial statement to Lake for repetition to bonding companies. According to comment (h), nothing more is required.
Ernst & Young's argument seems to be that, because Lake informed the accounting firm of four groups to whom the audited statement would be submitted rather than only one, Lake essentially gave no notice at all and Ernst & Young is not liable to any of these four groups for its alleged negligence. By identifying so many uses of the audited statement, Ernst & Young maintains that the Duffey letter simply provided an essentially limitless number of merely foreseeable users of the financial statement and thus there could be no liability.
Neither the supreme court in Max Mitchell nor the drafters of the Restatement which Max Mitchell adopts intended such a result. Rather, it is the notice of the intended use (or uses, as the case may be), not the size of the group of potential users, which is of primary importance.
Here Ernst & Young were notified that a bonding company would utilize its audit in determining whether to issue bonds. That was enough. It was error to enter summary judgment for Ernst & Young in this case.
REVERSED and REMANDED for further action consistent with this opinion.
COBB and GOSHORN, JJ., concur.
NOTES
[1] Specifically, Ernst & Young's audited financial statement failed to reveal that, on or about October 31, 1988, the Internal Revenue Service had recorded a federal tax lien in the amount of $147,695.72 against Lake for the nonpayment of corporate tax; that Lake had failed to deposit past due payroll withholding taxes in the amount of $110,073.77; and that as of April 24, 1989, Lake had failed to make past due payroll tax payments of $119,959.00 for the first quarter of 1989 (R. 33-34).
[2] Amwest also sought summary judgment which was denied.