**GULF LIQUIDS NEW RIVER PROJECT, LLC,**
Appellant,

v.

**GULSBY ENGINEERING, INC. & Gulsby–Bay Plant Partners,**
Appellees.

**Gulsby–Bay Plant Partners, Gulsby Engineering, Inc., Bay, Ltd. & National American Insurance Company, Appellants,**

v.

**Gulf Liquids New River Project, LLC & Williams Energy Marketing and Trading Company, Appellees.**

No. 01–08–00311–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 17, 2011.

Rehearing Overruled Nov. 10, 2011.

58

Barry Abrams, Jack Wilson Higdon, Robert P. Scott, Abrams Scott & Bickley, L.L.P., Houston, TX, Edward C. Dawson, Richard Bernard Farrer, Yetter Coleman, LLP, Michael A. Hatchell, Locke Lord Bissell & Liddell, LLP, Austin, TX, for Appellants.

Anton J. Rupert, Crowe & Dunlevy, P.C., Oklahoma City, OK, Christopher M. LaVigne, Russell J. Depalma, Stephen C. Carlin, Greenberg Traurig, LLP, Keith A. Langley, Oscar John Zevallos, Langley Weinstein Hamel LLP, Dallas, TX, Daryl L. Moore, Daryl L. Moore, P.C., Dwayne R. Day, Meyer, Knight & Williams, Eileen O'Neill, Timothy F. Lee, Ware, Jackson, Lee & Chambers, LLP, Michael Choyke, Thomas C. Wright, Wanda McKee Fowler, Jessica A. Zavadil, Wright Brown & Close, LLP, Linda Marshall, Houston, TX, Ricardo R. Reyna, Brock Person Guerra & Reyna, P.C., Sharon E. Callaway, Crofts & Callaway, San Antonio, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices BLAND and MASSENGALE.

## OPINION

SHERRY RADACK, Chief Justice.

After the parties' industrial construction contract went awry, a jury awarded over $300 million in contract, tort, and punitive damages to the construction project's general contractor and its insurer and against the project owner and its primary investor. Thereafter, the trial court partially granted the project owner's motion for JNOV, thereby disregarding the jury's tort and punitive findings and entering judgment for the contractor on the breach of contract and quantum meruit claims only. The project owner appeals from the judgment entered against it on the breach of contract claim/quantum meruit claims. The contractor and its insurer appeal from the trial court's granting of JNOV on the tort and punitive damage findings.

## BACKGROUND

The following is a brief recitation of the facts giving rise to these appeals. Additional facts will be introduced as they become relevant to the discussion of the issues presented.

### A. Tyler & Douglas Plan to Process Refinery Off–Gasses

Business partners John Douglas and James Tyler planned to build plants to process refinery "off-gasses" or waste products into more valuable chemicals that could be sold to third parties for profit. In 1998, their company, Gulf Liquids Corporation ["GLC"], contracted to purchase off-gasses from a refinery in Chalmette, Louisiana. GLC then contracted with several parties to purchase the processed off-gasses.

In 1999, Douglas and Tyler formed Gulf Liquids Holdings, LLC ["Holdings"], which, in turn, owned Gulf Liquids New River Project LLC ["Gulf Liquids"]. GLC then assigned to Gulf Liquids the contracts to purchase the off-gas from the Chalmette refinery and the contracts to sell the processed off-gasses.

Tyler and Douglas managed Holdings and Gulf Liquids LLC—an entity owned only by Tyler and Douglas. Gulf Liquids LLC managed Gulf Liquids. In 1999, Williams Corporation ["Williams"] invested $92.5 million in Holdings. Through its equity interest in Holdings, Williams possessed an indirect interest in Gulf Liquids.

### B. Gulf Liquids Hires Gulsby to Build the Base Project

The original plan called for two plants to be built. The first was to be a cryogenic plant to cool and liquify the off-gas from the Chalmette refinery. The second was to be a fractionator to then process the off-gas. Gulf Liquids hired Gulsby Engineering, Inc. ["Gulsby"] as the general contrac-

tor to build the plants on a turnkey basis. These two plants are referred to as the Base Project.

On October 29, 1999 Gulf Liquids and Gulsby executed two engineering, procurement, and construction ["EPC"] contracts—one for each of the Base Project plants. The contracts ["Contracts 1 and 2"] each covered a different plant, but in most other respects, were identical. Contract 1's fixed price was $13.5 million, to be paid when certain construction milestones were met. Contract 2's fixed price was $29 million, also payable when certain milestones were met.

### C. NAICO Bonds the Base Project

National American Insurance Company ["NAICO"] issued payment and performance bonds for Gulsby. Gulf Liquids, Gulf Liquids's lender, the Bank of Montreal, and Gulf Liquids's insurer, Winterthur International America Insurance Company, were the named beneficiaries of the bonds issued by NAICO.

### D. The Base Project is Modified after Closing

After Contracts 1 and 2 were signed, Gulf Liquids contracted to purchase off-gas from Motiva Enterprises' refinery in Convent, Louisiana. After obtaining the rights to this additional off-gas, Gulf Liquids needed more capacity to process it. Specifically, the fractionation plant needed to be expanded. Gulsby signed a $12 million change order to the Base Project contracts for the needed expansion, which provided that the work would be done without any change in the base contract price, but was "extra work" approved by Parsons, the independent engineer. Construction later began on the expansion.

### E. The Motiva Project is Begun

In the fall of 2000, Gulf Liquids obtained funding to construct a second cryogenic plant near the Motiva refinery in Convent, Louisiana. An additional facility, called the RPG Splitter, was also planned at the site of the original Base Project. These two undertakings together are referred to as the Motiva Project. Gulsby partnered with Bay, Ltd., another construction company, to form Gulsby–Bay Plant Partners ["GBPP"] to build the Motiva plants.

In February 2001, Gulf Liquids and GBPP entered two fixed-price contracts ["Contracts 3 and 4"] to build the second cryogenic plant and the RPG Splitter. The contracts for the Motiva Project are essentially the same as those for the Base Project. The contracts provided for milestone payments, as well as $12 million in fixed-fee payments. The fixed fee payments were to compensate Gulsby for the expansion it had undertaken on the Base Project due to the change order. Gulf Liquids paid $10 million of the fixed-fee payments at closing—the remaining $2 million was to be paid at the date the final milestone installment was paid.

### F. The Relationship between the Parties Deteriorates

By September 2000, Gulsby's cash flow had become unstable. Gulsby claimed that it had performed millions of dollars worth of work on the projects, but that Williams had instructed Gulf Liquids not to pay Gulsby for its work.

In February 2001, when the first Motiva Project milestone payments became due, Gulf Liquids paid $4 million to Gulsby, even though the money was owed to GBPP. Gulsby's partner, Bay, objected, and GBPP reinvoiced Gulf Liquids for the $4 million.

Meanwhile, Gulf Liquids was unhappy with progress of the project. Although the independent engineer had certified the base plants mechanically complete in March and April of 2001, there had been no successful performance test. Gulf Liquids was concerned that the plants were not functioning property.

In May 2001, Gulf Liquids discovered that Gulsby owed over $15 million to the subcontractors on the Base Project and that there were millions of dollars in liens being filed against the project. Gulsby claimed that it had not been able to pay the subcontractors because it had not been paid by Gulf Liquids.

### G. NAICO Begins Making Payments on the Bonds

Gulf Liquids made a demand for NAICO to fulfill its obligation on the payment bonds. NAICO initially complied and began paying the subcontractors on behalf of Gulsby. However, in July 2001, NAICO refused to pay under the performance bonds to ensure the completion of the project.

### H. Gulf Liquids Terminates Contracts 1 and 2

On September 5, 2001, Gulf Liquids notified Gulsby that it was in default of the Base Project contracts and gave Gulsby time to cure the default. On September 18, 2001, Gulf Liquids formally terminated the Base Project contracts. After Gulf Liquids terminated Contracts 1 and 2, GBPP abandoned the Motiva Project work sites.

### I. The Lawsuits Commence

The same day it abandoned the Motiva Project, GBPP sued Gulf Liquids, the Bank of Montreal, and Winterthur. Gulf Liquids answered and asserted counterclaims and third-party claims against Guls-

by and its joint venture partner, Bay. Gulsby, Bay, GBPP, and NAICO all asserted claims against Gulf Liquids and its investor, Williams. Gulsby and its related entities, including NAICO, also sued Tyler and Douglas in their individual capacities. Gulf Liquids sued Gulsby and GBPP for breach of the construction contracts, and GBPP for conversion. Shortly before trial in this case, Tyler and Douglas settled with Gulsby, NAICO, GBPP, and Bay.

### J. The Case Goes to Trial

After a lengthy jury trial, the case was submitted to the jury. In a 145–page jury charge, the trial court submitted Gulsby's claims against Gulf Liquids of breach of contract, fraud, fraudulent inducement, quantum meruit, and substantial performance. Claims against Williams for fraud, fraudulent inducement, and tortious interference with contract were also submitted.

The jury returned a verdict in favor of Gulsby, GBPP, NAICO, and Bay. The jury found Gulf Liquids liable to Gulsby and Bay for breach of contract, fraud, and fraudulent inducement. The jury found Williams liable to Gulsby, GBPP, Bay, and NAICO for fraud and fraudulent inducement. The jury found Williams liable to NAICO and Gulsby for tortious interference with contract. The jury also found that Gulf Liquids was Williams's alter ego, that Williams benefitted from Gulf Liquids's fraud, and that Williams participated in a civil conspiracy with Gulf Liquids.

After finding in Gulsby's favor, the jury awarded Gulsby approximately $17 million in actual damages and assessed punitive damages of $25 million against Gulf Liquids and $60 million against Williams. Gulsby elected to recover on its tort and quantum meruit theories.

After finding in NAICO's favor, the jury awarded NAICO $20,182,498 in actual damages and assessed punitive damages of $20 million against Gulf Liquids and $50 million against Williams.

### K. Judgment Notwithstanding the Verdict

After substantial postverdict briefing and argument, the trial court granted JNOV as to all of the tort, punitive damage, and vicarious-liability findings. The trial court then entered judgment for $5,016,682 on Gulsby's breach of contract claim and $5,746,077 on its quantum meruit claim against Gulf Liquids. The trial court entered judgment for GBPP for $4,360,155 on its breach of contract claim. The trial court further ordered that each party should bear its own attorney's fees.

### L. Appellate Mediation

After the first round of appellate briefs were filed in the case, the parties went to appellate mediation. GBPP, Bay, Gulf Liquids, and Williams settled all claims among them. Bay and GBPP withdrew their appellate briefs, and this Court granted an interlocutory dismissal of their appeals. Thus, the appellate issues regarding Contracts 3 and 4 have been settled.

### M. The Appeals

Gulf Liquids appeals, contending that the breach of contract and quantum meruit awards against it must be reversed.

Gulsby appeals, contending that the trial court erred by granting JNOV as to its tort claims against Gulf Liquids and Williams and by setting aside the exemplary damages.

NAICO appeals, contending that the trial court erred by granting JNOV as to its tort claims against Gulf Liquids and Williams.

## GULF LIQUIDS'S APPEAL

### A. *Breach of Contract*

In jury question 27, the jury was asked whether Gulf Liquids materially failed to comply with Contracts 1 and 2 by (1) "failing to pay Gulsby Engineering for the work performed under Contracts 1 and 2" or by (2) "failing to pay for additional work under approved change requests." The jury answered both questions affirmatively. In jury question 23, the jury was asked whether Gulf Liquids failed to comply with contracts 1 and 2 by (1) "failing to exercise good faith and reasonable judgment in determining whether proposed change requests were within the scope of the contracts," (2) "failing to exercise reasonable judgment with regard to its right to terminate Contracts 1 and 2," or (3) "[b]y wrongful means prevented Gulsby Engineering's performance under Contracts 1 and 2 by providing a Basis of Design that materially differed from the actual feedstream." Based on affirmative answers to each of these questions, the jury, in question 38, awarded $9,016,682 in breach of contract damages to Gulsby.[1]

In its first issue on appeal, Gulf Liquids contends that the trial court erred by entering judgment based on the breach-of-contract findings by the jury. Specifically, Gulf Liquids argues that the terms of the contract prevent the breach-of-contract finding because (1) Gulsby failed to comply with a condition precedent to receiving payment; (2) it did not breach the contract because it properly terminated the contract; (3) it did not breach the contract by refusing to pay for "extra work"; and (4) it did not breach the contract by preventing Gulsby from performing under the terms of the contract. Gulf Liquids does not contend that it paid Gulsby as required by the contracts. It contends, as a matter of law, that it was not required to do so because Gulsby failed to perform a condition precedent to its right to receive payment and the termination clauses of the contracts precluded a breach.

### 1. *Condition Precedent*

■ Gulf Liquids argues that the jury's finding that it breached Contracts 1 & 2 by failing to pay Gulsby what is owed under the contract cannot stand because, as a matter of law, the contract allowed it to withhold Gulsby's payment. Specifically, Gulf Liquids argues that the contract created a condition precedent to payment, which Gulsby failed to fulfill. Gulf Liquids's position is based on article 5.3 of the contract, which provides in part as follows:

> During the course of the Work, prior to completion of the Work, and *as a prerequisite for any payment* hereunder, *[Gulsby] shall provide evidence,* and [Gulf Liquids] shall be satisfied, *that all bills for equipment, materials, and supplies have been paid in full* and that there are no outstanding liens, claims, or other obligations outstanding against [Gulsby], [Gulsby's] work product, the Improvements, or the Sites, related to the Work to be performed under this EPC Contract.

Gulf Liquids also relies on article 10.2 of the contract, which provides as follows:

> *[Gulsby] shall furnish, monthly, evidence* satisfactory to [Gulf Liquids] and the Independent Engineer *that [Guls-*

---

1. Those damages were allocated as follows: (1) $1,270,588 for the contract price owed on Contract 1 less the amount paid by Gulf Liquids under the contract; (2) $2,836,346 for the contract price owed on Contract 2 less the amount paid by Gulf Liquids under the contract; (3) $2,066,855 change requests approved by, but not paid for by, Gulf Liquids on Contract 1, and (4) $2,842,893 for change requests approved by, but not paid for by, Gulf Liquids on Contract 2.

*by] has made payment of all bills for labor and materials and other liquidated or unliquidated claims as a condition to the right of[Gulsby] to receive payment from [Gulf Liquids] of any money due [Gulsby] hereunder.*

Gulsby responds that these clauses are not conditions precedent to receiving payment, but are merely a covenant of the contract, and that another contract provision required Gulf Liquids to request evidence of subcontractor payments before withholding its performance under the contract.

"A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement." *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976); *see II Deerfield Ltd. P'ship v. Henry Bldg., Inc.,* 41 S.W.3d 259, 264 (Tex.App.-San Antonio 2001, pet. denied). As such, a condition precedent may "relate either to the formation of contracts or to liability under them." *Hohenberg Bros.,* 537 S.W.2d at 3. "Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Id.; Deerfield,* 41 S.W.3d at 264. Although no words in particular are necessary for the existence of a condition, "such terms as 'if', 'provided that', 'on condition that', or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise." *Hohenberg Bros.,* 537 S.W.2d at 3; *Deerfield,* 41 S.W.3d at 264–65. "In the absence of such a limiting clause, whether a certain contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole and from the intent of the parties." *Hohenberg Bros.,* 537 S.W.2d at 3; *Deerfield,* 41

S.W.3d at 265. "However, where the intent of the parties is doubtful or where a condition would impose an absurd or impossible result then the agreement will be interpreted as creating a covenant rather than a condition." *Hohenberg Bros.,* 537 S.W.2d at 3. Because of their harshness and operation, conditions precedent are disfavored. *Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990); *Sirtex Oil Indus. Inc. v. Erigan,* 403 S.W.2d 784, 787 (Tex.1966).

Gulf Liquids argues that the plain language of articles 5.03 and 10.2 creates conditions precedent because both articles require proof that Gulsby's subcontractors have been paid "as a *pre-requisite* for any payment" and "as a *condition* to the right of [Gulsby] to receive payment."

If we were to consider articles 5.3 and 10.2 in isolation, we might agree with Gulf Liquids because the clauses use words such as "pre-requisite" and "condition," which usually indicate the creation of a condition precedent. *See Hohenberg Bros.,* 537 S.W.2d at 3; *Deerfield,* 41 S.W.3d at 264–65. However, when we consider the contract as a whole, as we must, *see Hohenberg Bros.,* 537 S.W.2d at 3, the intent of the parties to create a condition precedent rather than an obligation to perform under the contract, becomes ambiguous.

Specifically, article 10.3, which directly follows article 10.2, provides as follows: *If [GulfLiquids] has requested [Gulsby] to provide [GulfLiquids]* and the Independent Engineer *with evidence of payment and [Gulsby] has failed to do so* to the reasonable satisfaction of [Gulf Liquids] and the Independent Engineer, *[Gulf Liquids] may at its option withhold payment of any money due [Gulsby] hereunder* until expiration of any lien periods, and if any claims thereafter remain unpaid by [Gulsby], [Gulf Liq-

uids] may, whether or not liens have been filed in connection therewith, retain from the money due [Gulsby] a sufficient amount to fully protect [Gulf Liquids] against possibility of loss by reason of any unsatisfied liquidated or unliquidated claim or demand.

Unlike articles 5.3 and 10.2, article 10.3 does not contain any language making its duty to provide evidence that the subcontractors have been paid a "pre-requisite" or "condition" of its right to receive payment. In fact, article 10.3 provides that Gulf Liquids cannot withhold any money due Gulsby unless (1) Gulf Liquids has requested Gulsby to provide evidence that it has paid its subcontractors, and (2) Gulsby has failed to do so.

The Supreme Court has recently held that "absent clear language that a lien release is a condition precedent to a general contractor performing under the contract and receiving the contract balance owed to it," such provisions should be construed as covenants, not conditions precedent. *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 112 (Tex.2010).

Here, the conflict between articles 5.3 and 10.2 with article 10.3 makes it ambiguous as to whether the parties intended to create a condition precedent, thus we interpret the contract as creating a covenant, not a condition. *See* RESTATEMENT (SECOND) OF CONTRACTS § 227(2) (1981). Similarly, there is no "clear language" making Gulsby's duty to provide evidence that the subcontractor's had been paid a condition precedent, and, under *Solar Applications,* we should not construe such a duty to be a condition precedent. 327 S.W.3d at 112.

Therefore, we conclude that Gulsby's obligation to provide Gulf Liquids with evidence that the subcontractors had been paid was a covenant or obligation under the contract, not a condition precedent to performance. Accordingly, we reject Gulf's Liquids's argument that the breach-of-contract award cannot stand because Gulsby failed to satisfy a condition precedent.

### 2. *Exercised Termination Clause*

■ Gulf Liquids also contends that it did not breach Contracts 1 & 2 because terminating Gulsby was both proper and reasonable in light of the termination clauses in the contracts.

Article 16 of the contracts provided that Gulf Liquids could terminate the contracts with or without cause. To terminate for cause, Gulf Liquids was required to give Gulsby notice of its default and 10 days to cure its default. If terminated for cause, Gulsby was entitled to receive payment for any work it actually completed, less amounts Gulf Liquids was entitled to set-off. Article 16.3 of the contract also provided Gulf Liquids could terminate the contracts *without* cause. In the event of a termination without cause under Article 16.3, "[Gulsby's] sole and exclusive remedy shall be . . . to receive payment for the percentage of Work actually completed by Gulsby, plus overhead and profit equal to 8% of actual costs to date."

Finally, the termination clause provided that if Gulf Liquids wrongfully terminated Gulsby for cause, such termination "shall be deemed a termination without cause [under article 16.30]."

■ Gulf Liquids argues that because the contract permitted it to terminate the contract with or without cause, it cannot have breached the contract by terminating it. A provision that provides an owner the right to terminate a contract with or without cause is often referred to as "termination for convenience" clause. *Roof Systems, Inc. v. Johns Manville Corp.*, 130

S.W.3d 430, 442 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *see also* 2 PHILIP BRUNER & PATRICK O'CONNOR, *Construction Law* § 5:270 (2002). The purpose of such a provision is to permit the "owner to unilaterally cancel its contractual obligations [by terminating the contract] and still avoid committing a breach of contract which would expose it to damages." *Bruner & O'Connor*, supra, § 5:270. We agree that the act of terminating the contract is not itself a breach of contract by Gulf Liquids because it was merely exercising its right to terminate the contract with or without cause. However, terminating the contract does not excuse Gulf Liquids's breach of its obligation to pay that occurred prior to the time that it exercised its right to terminate; the prior breach by Gulf Liquids means that its termination of Gulsby was done without cause.

### 3. Extra Work

■ Gulf Liquids also appeals the breach-of-contract judgment to the extent that it includes payments for "extra work."[2] In jury question 23a, the jury found that Gulf Liquids breached the contract by "failing to exercise good faith and reasonable judgment in determining whether proposed change requests were within the scope of the contracts." In jury question 38(c) and (d), the jury awarded damages for "amounts owed by Gulf Liquids, but not paid for the approved change requests [on Contracts 1 and 2]". Gulf Liquids argues that it did not breach the contract by determining that certain claims were not compensable as "extra work." Specifically, Gulf Liquids argues

that "since [Gulsby] undisputedly failed to comply with the contracts' mandatory procedures governing extra work [requiring prior written authorization and a description on a written change order], Gulf Liquids could not have acted unreasonably or in bad faith in determining that [Gulsby] was not entitled to compensation for that claimed extra work."

Gulsby responds that because Gulf Liquids breached the contract, it cannot rely on the "procedural rights" set forth in the "extra work" provisions of the contract. We agree. In *City of Baytown v. Bayshore Constructors, Inc.*, 615 S.W.2d 792 (Tex.Civ.App.-Houston [1st Dist.] 1980, writ ref'd n.r.e.), a contractor sued its employer alleging ·that the contractor incurred damages caused by "extra work" as a result of the employer's failure to provide adequate plans and specifications for the project. *Id.* at 793. On appeal, the owner alleged that there was insufficient evidence to show that the contractor had submitted its extra work claims to the owner in a manner that complied with the terms of the contract. *Id.* This Court held that "when an owner breaches a building contract it relinquishes its contractual procedural rights concerning change orders and claims for additional costs." *Id.* at 793–94; *see also N. Harris Cnty. Junior Coll. Dist. v. Fleetwood Constr. Co.*, 604 S.W.2d 247, 254 (Tex.Civ. App.-Houston [14th Dist.] 1980, writ ref'd, n.r.e.) (holding same). Because Gulf Liquids failed to pay Gulsby under Contracts 1 & 2, it cannot now rely on the procedural provisions of the extra work clauses in

---

**2.** Article 1.4 defines "extra work" as "any item of Work not specified by or set out in this EPC Contract and not within the reasonable intent of its provisions, which [Gulsby] is required to perform. To the extent that the Extra Work is approved or authorized by [Gulf Liquids] and the Independent Engineer as provided for herein, such may be referred to as 'Work.'" Article 9.2 provides that "if the Project Manager and the Independent Engineer determine that all or a portion of the Work is not within the scope of this EPC contract, such Work shall be paid for as Extra Work."

those contracts to avoid payment for extra work.

#### 4. *Preventing Gulsby's performance*

In jury question 23, the jury found that Gulf Liquids materially failed to comply with the contracts because it "by wrongful means prevented [Gulsby's] performance under Contracts 1 and 2" by providing a Basis of Design that materially differed from the actual feedstream. We need not address this issue because we have already upheld liability findings that Gulf Liquids breached the contracts by refusing to pay Gulsby what it was owed under Contracts 1 and 2 and for its approved extra work.

Based on our resolution of these issues, we conclude that the trial court properly refused to disregard the jury's liability finding that Gulf Liquids breached Contracts 1 and 2 by refusing to pay Gulsby amounts due under those contracts and for approved "extra work."

We overrule Gulf Liquids's first issue on appeal.

#### B. *Reduction of Contract Damages*

In its second issue on appeal, Gulf Liquids contends that Gulsby's contract damages must be reduced because (1) the termination clause of the contracts limited damages, (2) the damages are not supported by sufficient evidence, (3) the damages should be reduced because of the "one-satisfaction rule." We agree that the termination clause limits Gulsby's contract damages.

#### 1. *The Termination Clause*

■ Gulf Liquids claims that "the district court was not at liberty to simply disregard Gulf Liquids's termination rights" under the contract, and that the trial court erred by submitting jury question number 38, which asked the jury to determine what amount of money would compensate Gulsby for Gulf Liquids's breach of contract. Gulf Liquids argues that the termination clause was a contractual limitation on the amount of damages Gulsby could recover.

The jury determined that Gulsby did not breach the contracts, thus Gulf Liquid's attempt to terminate for cause was wrongful, and, under the terms of the contract Gulf Liquids's termination is deemed a termination without cause. We address the effect of the termination-without-cause provision on Gulsby's right to recover benefit-of-the-bargain contractual damages.

■ One purpose of a termination-for-convenience clause is to prevent "benefit-of-the-bargain" damages in the event that the owner unilaterally and without cause terminates the contract. *See* 2 BRUNER & O'CONNOR, supra, § 5:270. Parties may also contractually agree to the measure of damages in the event of a breach. *See Fidelity & Deposit Co. v. Stool*, 607 S.W.2d 17, 24 (Tex.Civ.App.-Tyler 1980, no writ) ("[I]t is well established that parties having agreed upon the measure of damages for breach of their contract are accordingly bound."); *Buhler v. McIntire*, 365 S.W.2d 237, 239–40 (Tex.Civ.App.-Austin 1963, writ ref'd n.r.e.) ("The general rule seems to be that parties having agreed upon the measure of damages for breach of their contract are accordingly bound."). The termination-for-convenience clause in this case specifically limits Gulsby's damages in the event of a wrongful termination to "payment for the percentage of Work actually completed by Gulsby, plus overhead and profit equal to 8% of actual costs to date."

Gulsby, however, argues that, because Gulf Liquids breached the contract it cannot rely on the termination-for-convenience clause to limit its damages. Specifically, Gulsby relies on *City of Baytown*, 615 S.W.2d at 793–94, *Baker Marine Corp.*

v. *Weatherby Eng'g Co.*, 710 S.W.2d 690, 696 (Tex.App.-Corpus Christi 1986, no writ), and *Sterling Projects, Inc. v. Fields*, 530 S.W.2d 602, 606 (Tex.Civ.App.-Waco 1975, no writ), all of which hold that when an owner breaches a building contract, it relinquishes its procedural rights concerning change orders and claims for additional costs. None of these cases, however, addresses the issue of whether the breach of contract by an owner results in the forfeiture of contractual provisions that would limit the contractor's remedies.

Gulf Liquids argues that failing to enforce the contracts' limitation-of-damages provision would render the termination-for-convenience clause meaningless. We agree. The clause expressly contemplates that if Gulf Liquids **wrongfully terminates** Gulsby, the termination will be deemed a termination without cause, and limits Gulsby's damages accordingly. Such a clause would never be enforceable if by wrongfully terminating, the owner also loses the right to exercise the termination-for-convenience clause and the limitation-of-damages provision found therein.

Because the contract expressly contemplates that the owner may wrongfully terminate the contractor, and then limits the contractor's damages to those specified in the clause, we will not render that provision meaningless by holding that the owner's rights are waived by committing the very breach that the clause contemplates. Such circular reasoning would render the termination-for-convenience clause meaningless, which we will not do. *See Tenn. Gas Pipeline Co. v. Technip USA Corp.*, No. 01–08–00535–CV, 2008 WL 3876141, at *23 n. 11 (Tex.App.-Houston [1st Dist.] August 21, 2008, pet. denied) (refusing to nullify party's right to receive notice of breach based on party's breach). As such, we conclude that Gulsby's right to recover damages for breach of contract was limited to the amounts specified in the termination-for-convenience clause. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex.2003) (holding, even if insurer breached agreement, insured only entitled to remedies set forth in contract). The trial court therefore erred in submitting jury question 38(a) and (b), which permitted Gulsby to recover benefit-of-the bargain damages for the breach of Contracts 1 and 2.

 We also consider what effect, if any, the termination-for-convenience clause had on Gulsby's right to recover damages for approved extra work, which was submitted to the jury in question 38(c) and (d). While a termination-for-convenience clause prevents a contractor from recovering benefit-of-the-bargain damages because of the termination of the contract, any pre-termination claims that the contractor was owed more money for approved and completed extra work are preserved. *See* BRUNER & O'CONNOR, supra, § 5:270 (stating "if the [owner] owed the contractor more money as a result of differing site conditions or defective plans and specifications, then the [owner] cannot escape this liability merely by seeking to terminate the contract for convenience"). Thus, we conclude that Gulsby's right to recover for pre-termination extra work, which the jury found that Gulf Liquids had approved, which the jury found to be owed, and which was not included in the original contract price, is not limited by the termination-for-convenience clause. As such, the trial court did not err in submitting jury question 38(c) and (d), which permitted Gulsby to recover for pre-termination extra work done for contracts 1 and 2.

### 2. One–Satisfaction Rule and Sufficiency of Damages Evidence

Additionally, Gulf Liquids argues that Gulsby's contract damages should be reduced by $2,500,000 because "shortly be-

fore trial [Gulsby] signed, benefitted from, and was party to a settlement agreement between [Gulsby] and NAICO, on one hand, and Tyler and Douglas on the other hand." Gulf Liquids also argues that there is insufficient evidence to support the contract damages awarded. Because we agree with Gulf Liquids that the contract damages should have been limited by the termination-for-convenience clause, we need not address these alternative issues regarding the contractual damages awarded, and decline to do so.

Because we agree that the contract provisions limited Gulsby's damages, we sustain Gulf Liquid's second issue on appeal.

### C. Conclusion Regarding Breach of Contract

Because we have held that Gulsby's obligation to show proof that its subcontractors had been paid was not a condition precedent to its right to receive payment from Gulf Liquids, the trial court did not err by submitting jury question number 27, which established Gulf Liquids's contractual liability for breach of contract for failure to pay for work performed under Contracts 1 and 2 and for additional work under approved change requests.

However, we hold that the trial court erred in submitting jury question 38(a) and (b), which allowed the jury to determine benefit-of-the-bargain damages for Gulf Liquids's failure to pay Gulsby under Contracts 1 and 2. The contract between the parties clearly limited the damages recoverable to preclude benefit-of-the-bargain damages. The trial court, however, did not err by submitting jury question 38(c) and (d) because the termination-for-convenience clause does not limit the damages recoverable by Gulsby for pre-termination, approved extra work.

Because we cannot determine how the trial court arrived at its $5,016,682 breach

of contract award on Gulsby's breach or what portion of that award was erroneously attributable to benefit-of-the-bargain damages, we reverse the damages award for breach of contract and remand for further proceedings. *See* Tex.R.App. P. 44.1(b).

### D. Quantum Meruit

The trial court's judgment awarded Gulsby $5,016,682 from Gulf Liquids on Gulsby's quantum meruit claims. In its third issue on appeal, Gulf Liquids argues that quantum meruit is precluded because an express contract covers the subject matter of the recovery. *See In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 740 (Tex.2005). Gulsby responds that construction contracts provide an exception to this general rule.

▬▬▬ Quantum meruit is an equitable theory of recovery based on an implied agreement to pay for benefits received. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992). Recovery under the theory of quantum meruit is prohibited if an express contract covers the services or materials for which the claimant seeks recovery. *Truly v. Austin,* 744 S.W.2d 934, 936 (Tex.1988). However, there is an exception with respect to construction contracts. *See id.* at 937. A contractor may recover the reasonable value of the services rendered and accepted or the materials supplied under the theory of quantum meruit if: (1) the services rendered and accepted are not covered by the contract; (2) the contractor partially performed under the terms of an express contract, but was prohibited from completing the contract because of the owner's breach; or (3) the contractor breached but the owner accepted and retained the benefits of the contractor's partial performance. *See Truly,* 744 S.W.2d at 936–37; *DiMiceli v. Affordable Pool Maintenance, Inc.,* 110

S.W.3d 164, 169–70 (Tex.App.-San Antonio 2003, no pet.); *Garcia v. Kastner Farms, Inc.*, 789 S.W.2d 656, 661 (Tex.App.-Corpus Christi 1990, no writ).

Gulf Liquids argues that the contractor exception does not apply because (1) the services rendered and accepted were covered by the contract, and (2) Gulsby is not entitled to recover quantum meruit based on partial performance.

### 1. Services Rendered and Accepted Covered by Contract

In jury question 40, the jury was asked to determine whether Gulsby "performed any compensable work for Gulf Liquids that was outside the scope of Contracts 1 and 2." The question then submitted a laundry list of 18 items that Gulsby claimed it performed that were outside the scope of the contracts. The jury answered "YES" to 16 of the 18 items of Gulsby's work.

On appeal, Gulf Liquids complains that the 16 items for which Gulsby recovered in quantum meruit were either included in the contracts' scope of work, or included in the contract as "extra work." Gulf Liquids also argues that "the quantum meruit liability question impermissibly asked the jury to decide a question of law: whether certain items of work were 'outside the scope' of the contracts, a pure question of contract interpretation properly for the trial court, not the jury."

 The construction of a written instrument is a question of law for the trial court. *MCI Telecomm., Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999). When the evidence shows that no contract covers the service at issue, *then* the question of whether a party may recover in quantum meruit is for the trier of fact. *See Producers Grain Corp. v. Lindsay*, 603 S.W.2d 326, 328 (Tex.Civ.App.-Amarillo 1980, no writ).

[19] The question this Court must decide is whether the 16 items submitted in the quantum meruit damage question were, in fact, covered by the contract. Gulf Liquids claims that the contract covers all 16 items because each item was either within the "scope of work" or was "extra work" as those terms are defined by the contract.

Article 3.1 of the Contract defines the "scope of work" as all of the items listed on Exhibit A of the Contract. Exhibit A contains five pages of "work" to be performed by Gulsby. "Work" is defined in Article 1.12 as "the activity specified herein for accomplishment of the engineering, design, procurement, fabrication, reconditioning, and installation of the Improvements as authorized by [Gulf Liquids]. When used as a noun, Work includes the engineering, design, fabrication, and construction of improvements."

The contract also contains what the parties refer to as "extra work" provisions. Article 1.4 defines "extra work" as "any item of Work not specified by or set out in this EPC Contract and not within the reasonable intent of its provisions, which [Gulsby] is required to perform. To the extent that the Extra Work is approved or authorized by [Gulf Liquids] and the Independent Engineer as provided for herein, such may be referred to as 'Work.'" Article 3.3 of the Contract provides that "[Gulf Liquids], with the concurrence of the Independent Engineer, shall have the right to alter, deter from, or add to the Work described in Exhibit A hereto, provided that such alteration, deletion or addition is directly related to the Work described in Exhibit A hereto and does not constitute or affect a substantially different undertaking." Finally, Article 9.2 provides that "if the Project Manager and the Independent Engineer determine that all or a portion of the Work is not within the scope of

this EPC contract, such Work shall be paid for as Extra Work."

Gulsby argues that these provisions do not bar its recovery for quantum meruit because the jury found that Gulsby's performance of the 16 items listed was "outside the scope" of the contracts. Thus, Gulsby argues that "the jury necessarily found that the work constituted a 'substantially different undertaking' that the work the parties agreed to under the contracts."

We disagree with Gulsby's interpretation. "Extra work" is by definition "Work not specified by or set out in this EPC Contract and not within the reasonable intent of its provisions." Even if the items listed in the quantum meruit question are outside the "scope of the contract," they are "extra work" as long as they are "directly related to the work" and "do not or constitute or affect a substantially different undertaking." There is no jury finding that the items listed were not "directly related to the work" or that they were a "substantially different undertaking."

Thus, we conclude that the 16 items listed in the quantum meruit question were either within the "scope of work" or were "extra work." Because the items listed in the quantum meruit question were covered by the express terms of the contract, no quantum meruit claim will lie. *See Truly,* 744 S.W.2d at 936.

### 2. *Partial Performance*

 We next consider whether Gulsby is entitled to recover under quantum meruit because it partially performed, but was prohibited from completing performance because of Gulf Liquids's breach. Under Texas law, when a contractor has substantially performed a building contract, he is entitled to bring a contract cause of action to recover the full contract price less the cost of remedying those defects that are remediable. *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 481 (Tex.1984). If, however, the contractor has not substantially performed, he may bring a quantum meruit claim as an alternative to a contract claim. *Dobbins v. Redden,* 785 S.W.2d 377, 378 (Tex.1990); *see also Murray v. Crest Constr., Inc.,* 900 S.W.2d 342, 345 (Tex.1995) (holding that because contractor had not substantially performed, it could not recover under contract but could bring cause of action in quantum meruit).

Here, in jury question 37, the jury found that Gulsby had substantially performed the work to be completed under the Contracts. Thus, Gulsby may recover its damages under the contract, but it may not maintain a cause of action for quantum meruit. *See DiMiceli,* 110 S.W.3d at 170 (stating that because contractor completed the contract, it "cannot recover on the theory of quantum meruit on the basis of partial performance").

Accordingly, we sustain Gulf Liquids's third issue on appeal. We reverse the quantum meruit award and render judgment that Gulsby take nothing on its quantum meruit claim against Gulf Liquids.

### E. *Conditional Issues*

In three conditional issues on appeal, Gulf Liquids contends that (1) there was charge error on the breach of contract questions, (2) there was *Casteel*[3] error in the charge, and (3) that the trial court erroneously admitted evidence of its insurance. Because we have reversed and rendered judgment against Gulsby on its quantum meruit claims and reversed and remanded its breach of contract claims, we need not reach Gulf Liquids's conditional issues because they would afford it no

---

**3.** *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000).

further relief than that it has already received.

## GULSBY'S APPEAL

In addition to the breach of contract discussed above, the trial court also submitted fraudulent inducement, fraud, and punitive damage issues to the jury. The jury found in Gulsby's favor and awarded actual and punitive damages accordingly. Gulsby elected to recover its tort damages rather than its breach-of-contract damages. Gulf Liquids and Williams moved for judgment notwithstanding the verdict ["JNOV"], which the trial court granted. Gulsby appeals, contending that the trial court erred in granting JNOV and (1) disregarding the jury's fraud findings; (2) disregarding the jury's findings that Williams tortiously interfered with Gulsby's contracts; (3) disregarding the jury's findings that Williams is responsible for Gulf Liquids's conduct; (4) setting aside the punitive damages awards; (5) excluding Jerry Gulsby's testimony about the value of his company; (6) reducing the damages on Gulsby's breach-of-contract and quantum-meruit claims; and (7) failing to award Gulsby its attorney's fees.

## A. JNOV of Fraudulent Inducement Claims

In its first issue on appeal, Gulsby contends the trial court erred by granting JNOV on its fraudulent inducement claims against Gulf Liquids. In jury question 57, the jury was asked whether Gulf Liquids fraudulently induced Gulsby to enter into Contracts 1 and 2. The jury was instructed to consider only Gulf Liquids's acts or omissions prior to the execution of Contracts 1 and 2. The jury answered question 57 affirmatively and awarded the following damages: (a) $1,270,588 for the contract price owed on Contract 1 less the amount paid by Gulf Liquids under the

contract; (b) $2,836,346 for the contract price owed on Contract 2 less the amount paid by Gulf Liquids under the contract; (3) $2,000,000 for monies owed on the Geismar expansion less the amount paid by Gulf Liquids; (4) $66,855.00 for amounts owed by Gulf Liquids, but not paid under change requests on Contract 1; (5) $2,842,893 for amounts owed by Gulf Liquids, but not paid under change requests on Contract 2. On appeal, Gulsby contends the trial court erred in granting JNOV and disregarding the jury's findings on fraudulent inducement of contract.

### 1. Standard of Review and Law Applicable to Fraudulent Inducement

A trial court may disregard a jury finding and enter a JNOV if the finding is immaterial or if there is no evidence to support one or more of the jury findings on issues necessary to liability. *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003); *Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994); *Williams v. Briscoe,* 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.). A trial court may grant a motion for JNOV if a directed verdict would have been proper. Tex.R. Civ. P. 301.

Fraudulent inducement is a type of fraud claim that requires a showing that (1) a false material misrepresentation was made that was either known to be false when made or was asserted without knowledge of its truth or falsity, (2) it was intended to be acted on, (3) it was relied on, and (4) it caused injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998). "As a rule, a party is not bound by a contract procured by fraud." *Formosa Plastics,* 960 S.W.2d at 46. Indeed, "the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it." *Id.* (quoting *Bates v. Southgate,* 308

Mass. 170, 31 N.E.2d 551, 558 (1941)). Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Haase v. Glazner,* 62 S.W.3d 795, 798 (Tex.2001); *Clark v. Power Mktg. Direct, Inc.,* 192 S.W.3d 796, 799 (Tex.App.-Houston [1st Dist.] 2006, no pet.). That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. *Haase,* 62 S.W.3d at 798–99.

### 2. False, Material Misrepresentations Claimed by Gulsby

Gulsby points to four misrepresentations by Gulf Liquids that induced it to enter the contracts: (1) the size of the Chalmette site, (2) the components and contaminents in the feedstream from the Chalmette plant; (3) a promise to reimburse Gulsby for additional surety-bond coverage; and (4) a promise to pay Gulsby for increased utility costs.

First, Gulsby points to evidence that Douglas, of Gulf Liquids, misrepresented the size of the Chalmette site. Douglas told Jerry Gulsby that the Chalmette site was 1.5 to 2.0 acres in size. Actually, the site was only .8 acres. Gulsby testified that he relied on Douglas's representation about the size of the site in designing and pricing the Chalmette plant. After Gulsby executed the contracts, Jerry Gulsby discovered the true size of the site. His plans then had to be modified to build the plant vertically, rather than horizontally. The cost of having to adjust the plans cost Gulsby an additional $2.38 million.

Second, Gulsby introduced evidence that Gulf Liquids misrepresented the "feedstream" or off-gasses that would leave the Chalmette Refinery and be processed at the Chalmette cryogenic plant. Douglas testified that he was aware that an accurate knowledge of the feedstream was es-

sential to Gulsby's design of the plant. One and one-half months before the contracts were signed, Gulf Liquids provided a "basis of design" to Jerry Gulsby. The basis of design was based on five years of historical data from the Chalmette refinery, which Gulf Liquids reduced to a single document containing specific numbers of each component and contaminant in the feedstream. Gulsby used this basis of design to design the plant. However, the basis of design was inaccurate. Specifically, the basis of design stated that 10% of ZSM–5, a catalyst, would be in the feedstream. The use of ZSM–5 in the feedstream was critical to make the project profitable. However, the amount of ZSM–5 in the feedstream was actually much lower. Gulsby introduced a memo created before the contracts were signed in which a Gulf Liquids employee states that "we are kidding ourselves if we think we'll see 10 + % ZSM–5 additions anytime soon (2 yrs)" at the Chalmette refinery.

Additionally, the basis of design was based on historical data and thus it did not account for the fact that the Chalmette Refinery had recently begun processing "Cerro Negro crude," a high-sulfur crude oil that increased the amount of sulfur in the feedstream by 400%. As a result of the increased sulfur in the feedstream, Gulsby had to modify plans for the plant, which increased its cost.

Third, Gulsby introduced evidence that before the contracts were signed, Gulsby obtained two $10 million surety bonds from NAICO. However, before closing, Douglas told Gulsby that the contracts had to be bonded for the full contract price. The cost for the additional bonding was $1.875 million. When Gulsby complained that he could not absorb such a "hit right off the top," Douglas promised Gulsby that if it obtained the additional bonding, Gulf Liquids would reimburse Gulsby for the

increased cost. Jerry Gulsby testified that he would not have signed the contracts had Gulf Liquids not promised to reimburse Gulsby for the increased bonding costs. Gulf Liquids never reimbursed Gulsby for the additional bonding expenses.

Finally, Gulsby presented evidence that shortly before closing he determined that he would actually need to increase the horsepower of the plant. When Jerry Gulsby expressed his reluctance to sign the contracts because need for increased horsepower would be a "15 percent hit" on the contract, Gulf Liquids promised to reimburse Gulsby for the additional utility costs if Gulsby would sign the contracts as scheduled. Gulf Liquids never reimbursed Gulsby for the additional utility costs necessary to increase the horsepower of the plant.

### 3. *Justifiable Reliance*

Gulf Liquids, however, claims that these misrepresentations are not actionable. Specifically, Gulf Liquids argues that the statements are immaterial and should not have been submitted to the jury because (1) "this is inherently a breach-of-contract case, and punitive damages cannot be assessed for breach of contract"; and (2) the merger clauses of the contracts preclude Gulsby's reliance on any purported oral misrepresentation. We agree with the latter.

 Gulf Liquids argues that, in light of several contract provisions, Gulsby could not have justifiably relied on the claimed misrepresentations. Fraud requires that a plaintiff show actual and justifiable reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex.2010). In evaluating justification, we consider whether "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely

that there is actual reliance on the plaintiff's part." *Id.* (*quoting Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1026 (5th Cir.1990)). "[A] person may not justifiably rely on a representation if there are 'red flags' indicating such reliance is unwarranted." *Id.* (quoting *Lewis v. Bank of Am., N.A.*, 343 F.3d 540, 546 (5th Cir. 2003)).

### a. *Additional Agreements Made Pre–Contract*

In its motion for JNOV, Gulf Liquids, relying on *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179–80 (Tex. 1997), argued that the merger clauses in the contracts preclude Gulsby's reliance on any pre-contract oral representations or modifications, thus foreclosing its fraudulent-inducement cause of action as a matter of law.

In *Schlumberger*, the Swansons and Schlumberger became joint venturers in a project to mine diamonds from the ocean floor. 959 S.W.2d at 173. After a dispute between the parties arose, the Swansons sold their interest in the joint venture to Schlumberger. *Id.* at 174. As a part of the sale, the Swansons relinquished all rights, claims, and interests in the offshore diamond project and released all causes of action against Schlumberger, known or unknown. *Id.* In the release, the Swansons specifically agreed that they were not relying on any statement or representation by Schlumberger, that they were relying on their own judgment, and that they had been represented by counsel who had explained the entire contents and legal consequences of the release. *Id.* Later, the Swansons sued Schlumberger, claiming that Schlumberger had fraudulently induced them to sell their interest in the joint venture at an undervalued price. *Id.* After a jury found in favor of the Swan-

sons, Schlumberger claimed on appeal that the release precluded all of the Swansons' tort claims as a matter of law. *Id.* at 175. Recognizing that parties should be able to effectively settle their disputes, the court agreed with Schlumberger, holding that when the parties' intent is clear and specific, they can disclaim reliance on any oral representations thus negating a fraudulent inducement claim. *Id.* at 179, 181.

In *Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 61 (Tex.2008), the supreme court expressly declined "to adopt a per se rule that a disclaimer [of reliance] automatically precludes a fraudulent-inducement claim," recognizing that "facts may exist where the disclaimer lacks 'the requisite clear and unequivocal expression of intent necessary to disclaim reliance' on the specific representations at issue." *Id.* at 61, 60 (quoting *Schlumberger,* 959 S.W.2d at 179). The court further advised that when determining whether a waiver-of-reliance provision is binding, court must examine the contract itself and the totality of the surrounding circumstances, including whether (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties discussed the issue which has become the topic of dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear. *Id.* at 60.

Gulf Liquids claims that Article 25.10 of the contracts expressly disclaims any reliance on oral representations by Gulf Liquids; thus Gulsby's reliance, a necessary element of fraudulent inducement, fails.

Article 25.10 provides as follows:

... [T]his EPC Contract and the attached Exhibits hereto constitute the entire agreement between [Gulf Liquids] and [Gulsby] pertaining to engineering, design, procurement, fabrication, and installation of the Work. None of these documents may be amended except by a writing signed by both Parties. No promise, agreement, or representation not set forth in this EPC Contract or an attached Exhibits [sic] shall be of any force or effect.

██ We note that three of the four misrepresentations alleged by Gulsby—that it was promised additional compensation for extra insurance and horsepower costs and representations about the site size—involve alleged oral agreements made before the contract was signed and were never incorporated in the EPC contracts by the parties. Thus, the merger clause expressly covers these situations and prohibits evidence of additional pre-contract terms from serving as the basis for a fraudulent inducement claim. *See IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 125–28 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (providing that provisions that contract was "entire agreement" and requiring any modifications to be in writing barred fraudulent-inducement claim under *Schlumberger* ).

### b. Feedstream Components

██ The remaining misrepresentation—feedstream components—is not specifically addressed in the merger clause. Thus, we consider whether Gulsby could reasonably rely or was damaged by an erroneous basis of design, which was incorporated in the contract as Exhibit B, and provided that 10% of the catalyst ZSM–5 would be in the feedstream.

Gulf Liquids argues that Gulsby was required to create a design that would function under the feedstream provided, and that, if the feedstream provided was inaccurate, Gulf Liquids, not Gulsby, would

be the party harmed. In other words, Gulf Liquids argues that Gulsby would not be in breach of contract if it failed to design a plant that would function because of an erroneously defined feedstream. We agree.

Article 8.2 of the Contract provides as follows:

> [Gulsby] hereby warrants the treating and process design and all Improvements and equipment furnished, constructed or installed by [Gulsby] to be free from defect in design and that, provided the Improvements and equipment are utilized in accord with all reasonable operating practices, *and containing constituents and mol percentages of constituents which do not materially differ from Exhibit B,* the Work Improvements, and equipment [Gulsby] shall produce the recovery rates as stated on Exhibit C.

This section of the contract makes it clear that Gulsby was not responsible for failure of its design to produce recovery rates indicated in the contract if the components of the feedstream differed materially from those set forth in Exhibit B. Because Gulsby could not provide a working system based on an erroneous basis of design, it was not legally responsible and thus cannot have suffered any harm because of the erroneous design.

Furthermore, article 3.3 of the contract provides that "[Gulf Liquids] . . . shall have the right to alter, delete from, or add to the work described in Exhibit A, provided that such alteration, deletion, or addition is directly related to the Work described in Exhibit A hereto and does not constitute or affect a substantially different undertaking." The contract further provides that, under certain conditions, Gulf Liquids will pay for alterations or additions to the Work by way of written change orders as Extra Work.

Article 3.3 gives Gulsby notice in the contract that Gulf Liquids had the right to alter, delete, or change the Work of the Contract. Thus, Gulsby cannot claim that it reasonably relied on the basis of design, including the feedstream set forth therein, as being unchangeable.

In sum, Gulsby cannot show that it was harmed by the change in the feedstream numbers because it was not contractually bound to design a system that would function with the altered feedstream numbers. Also, Gulsby cannot show that it reasonably relied on the feedstream calculations because the contract gave Gulf Liquids the right to change the feedstream calculations and thereby change the scope of Gulsby's work. We note that any change in the scope of the Work by Gulf Liquids would have given Gulsby the right to request extra compensation for the extra work. Thus, alterations in the feedstream could have led to a claim for extra work compensation by Gulsby. Accordingly, the trial court did not err in granting JNOV and disregarding the fraud findings against Gulf Liquids.

We overrule Gulsby's first issue on appeal.

### B. JNOV of Tortious Interference Claims against Williams

In its second issue on appeal, Gulsby contends the trial court erred in disregarding the jury's findings that Williams tortiously interfered with Gulby's contracts. In jury question 61a, the jury was asked whether Williams intentionally interfered with Contracts 1 and 2. The jury was instructed that "[i]nterference is intentional if committed with the desire to interfere with the contract or with the belief that interference is substantially certain to result. The jury answered question 61a affirmatively. In jury question 62, the jury

was also asked whether Williams's interference was justified. The jury was instructed that "[i]nterference with a contract is justified if the interfering party had a good faith belief that it had a right to do so." The jury answered question 62 negatively. In jury question 67, the jury awarded the same amount of damages for Williams's tortious interference as it did for Gulf Liquids's fraudulent inducement.

A trial court may disregard a jury finding and enter a JNOV if the finding is immaterial or if there is no evidence to support one or more of the jury findings on issues necessary to liability. *Tiller*, 121 S.W.3d at 713.

Gulsby's position at trial was that Williams tortiously interfered with its contracts with Gulf Liquids by, essentially, taking over the change order process and preventing Gulf Liquids from paying Gulsby for change orders that Gulf Liquids and the independent engineer had already approved. Williams, however, responds that the trial court properly disregarded the jury's findings that it tortiously interfered with Gulsby's contracts because it was, as a matter of law, justified in interfering. We agree with Williams.

In jury question 62a, the jury was asked whether Williams's interference was justified and was instructed that "[i]nterference with a contract is justified if the interfering party had a good faith belief that it had a right to do so." The jury answered question 62a negatively. Williams argues that, because it established its legal right to interfere as a matter of law, the jury's negative finding on the issue is immaterial.

 Justification is an affirmative defense to tortious interference with contract and tortious interference with prospective business relations. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex.2000) (citing *Calvillo*

*v. Gonzalez*, 922 S.W.2d 928, 929 (Tex. 1996)). The justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Id.; Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996). If a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant. *Prudential*, 29 S.W.3d at 80; *Tex. Beef Cattle*, 921 S.W.2d at 211. Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith. *Prudential*, 29 S.W.3d at 80; *Tex. Beef Cattle*, 921 S.W.2d at 211.

 Williams argues that it was exercising its own legal rights in regard to the change orders, thus its actions were justified. We agree. The record shows that, under the Holdings Operating Agreement between Williams and Tyler and Douglas of Gulf Liquids, Williams had the contractual right to require Tyler and Douglas to obtain its express written consent before "incur[ring] any liability or mak[ing] any single expenditure or series of related expenditures in an amount exceeding $10,000.00." Enforcing or complying with one's own valid contract does not constitute unjustifiable interference with another's contract. *Maynard v. Caballero*, 752 S.W.2d 719, 721 (Tex.App.-El Paso 1988, writ denied).

Because Williams established, as a matter of law, that it was exercising its own contractual right to require Gulf Liquids to

obtain its approval before authorizing expenditures, it has shown that its actions were justified. Whether Williams acted in good faith is, thus, irrelevant, *Tex. Beef Cattle*, 921 S.W.2d at 211. Thus, the jury's finding in jury question 62a that Williams did not act in good faith is also irrelevant. Because, as a matter of law, Williams's interference was justified, the trial court did not err in disregarding the jury's finding that Williams tortiously interfered with Gulsby's contracts. Accordingly, we overrule Gulsby's second issue on appeal.

### C. Williams's Responsibility for GulfLiquids's Conduct

In issue three, Gulsby contends that the trial court erred in disregarding the jury's findings that Williams (1) benefitted from Gulf Liquids's fraud, (2) was responsible for Gulf Liquids's conduct, and (3) conspired with Gulf Liquids to fraudulently induce Gulsby to enter the contracts. However, we have already held that Gulf Liquids did not commit fraud, thus Williams cannot be held vicariously liable for Gulf Liquids's fraud. Accordingly, we overrule Gulsby's third issue.

### D. Punitive–Damage Awards

In issue four, Gulsby contends the trial court erred disregarding the jury's punitive-damage findings and setting aside the punitive-damage awards against Gulf Liquids and Williams. Because we have held that these parties committed no underlying tort, the trial court properly disregarded the punitive-damages awards. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex.1998); *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex.1993) (holding recovery of punitive damages requires finding of independent tort with accompanying actual damages).

Accordingly, we overrule issue four.

### E. Testimony About the Value of Gulsby

In its fifth issue, which is a conditional issue on appeal, Gulsby argues that if this Court does not hold in its favor on the tort issues, the case should be nonetheless reversed and remanded because the trial court did not permit Jerry Gulsby to testify about the value of his company. Gulsby contends that the evidence was relevant to show its damages as a result of Gulf Liquids's and Williams's fraud and tortious interference.

Erroneously excluded evidence constitutes reversible error if it is both controlling on a material issue and not cumulative. *Mentis v. Barnard*, 870 S.W.2d 14, 16 (Tex.1994). Here, the excluded evidence went to the issue of consequential damages suffered by Gulsby as a result of Gulf Liquids's and Williams's alleged torts. However, because we have held that the trial court properly disregarded the tort liability findings against Gulf Liquids and Williams, Gulsby's damages are not a material issue in the case. Thus, error, if any, in not allowing Jerry Gulsby to testify about the value of his company, is harmless.

We overrule Gulsby's fifth issue.

### F. Reducing Gulsby's Breach–of–Contract and Quantum Meruit Awards

In its sixth issue on appeal, which is a second conditional issue, Gulsby argues that the trial court erroneously reduced the damages awarded for both breach of contract and quantum meruit, when only one such reduction was warranted. Specifically, Gulsby points out that in response to jury question 38, the jury awarded Gulsby $9,016,682 for breach of contract, and in response to jury question 41, the jury awarded Gulsby $7,746,077 for quantum meruit. However, both of these jury ques-

tions included a $2 million award for Gulsby's work on the Geismar expansion. Thus, Gulsby asked that its judgment be reduced by $2 million so that it would not be compensated for the Geismar expansion twice. However, when the trial court entered judgment, it reduced both the breach-of-contract and quantum meruit awards by $2 million—for a total reduction of $4 million.

Gulsby contends the trial court erred in reducing its quantum meruit recovery by $2 million. Neither Gulf Liquids nor Williams address this issue in their response briefs. However, we have already held that Gulsby's breach-of-contract and quantum meruit awards must be reversed, thus this issue is moot.

We overrule Gulsby's sixth issue.

### G. Attorney's Fees

In its seventh issue on appeal, which is also its final conditional issue, Gulsby contends the trial court erred in awarding $0 in attorney's fees on its breach-of-contract claim based on its failure to segregate its fees between its breach-of-contract and fraud claims.

 The remedy for unsegregated attorney's fees is a new trial on the issue, not rendition of a take-nothing judgment on the claim for attorney's fees. See Tony Gullo Motors v. Chapa, 212 S.W.3d 299, 310–11 (Tex.2006); Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 11 (Tex.1991). "Unsegregated attorney's fees … are some evidence of what the segregated amount should be." Tony Gullo Motors, 212 S.W.3d at 314. Because we have reversed and remanded Gulby's breach-of-contract claims for further proceedings,

and because the testimony of the unsegregated amount constituted some evidence of the segregated attorney's fees, we reverse the trial court's take-nothing judgment on Gulsby's attorney's fees claims and remand for further proceedings.

We sustain Gulsby's seventh issue.

### NAICO'S APPEAL

### A. Background

NAICO issued payment and performance bonds for Gulsby on Contracts 1 and 2. Gulf Liquids, its lender, and its insurer were the beneficiaries of the bonds issued. In May 2001, Gulf Liquids discovered that Gulsby owed over $15 million to the subcontractors on the Base Project and made a demand for NAICO to fulfill its obligation on the payment bonds. NAICO initially complied and began paying the subcontractors on behalf of Gulsby. However, in July 2001, NAICO refused to pay under the performance bonds to ensure the completion of the project. In September 2001, Gulf Liquids terminated the contracts. NAICO sued Gulf Liquids and Williams to recover the amounts it paid on the bonds, plus punitive damages.

### B. JNOV of Tort Claims against Gulf Liquids and Williams

In jury question number 58(2), the jury found that Gulf Liquids and Williams fraudulently induce[4] NAICO to issue the bonds by failing to disclose a material fact. The jury was instructed to consider only acts or omissions by Gulf Liquids and Williams that occurred prior to the execution of the bonds. In jury questions 61 and 62, the jury found that Williams tortiously interfered with the bonds and that

---

4. Regarding its fraudulent inducement claims, NAICO contends that Gulf Liquids misrepresented or concealed (1) the correct nature, terms, and scope of the contracts, (2) that the contracts contained the entire agreement between Gulf Liquids and Gulsby, and (3) that Gulf Liquids alone controlled the projects.

its interference was not justified. In jury questions 63 and 64, the jury found that Gulf Liquids and Williams committed fraud against NAICO.[5] In jury question 65, the jury found that Williams partook of the benefits arising from the fraud against NAICO. In jury questions number 70 and 71, the jury awarded $20,182,498 in actual damages based on the jury's tort findings.

The jury was then found that there was clear and convincing evidence of (1) harm to NAICO as a result of Gulf Liquids's and Williams's fraud, and (2) malice by Williams. Based on these findings, the jury assessed $20 million in punitive damages against Gulf Liquids and $50 million in punitive damages against Williams.

Nevertheless, after post-verdict motions, the trial court granted JNOV as to these tort findings and entered judgment that NAICO take nothing on its tort claims against Gulf Liquids and Williams. In issues one through four, NAICO appeals, contending the trial court erred by granting JNOV on its fraud and tortious interference claims.

### 1. Standard of Review

A trial court may disregard a jury finding and enter a JNOV if the finding is immaterial or if there is no evidence to support one or more of the jury findings on issues necessary to liability. *Tiller*, 121 S.W.3d at 713. A trial court may grant a motion for JNOV if a directed verdict would have been proper. Tex.R. Civ. P. 301.

### 2. Materiality

■ Gulf Liquids and Williams argue that the tort questions were immaterial and should not have been submitted to the jury. Specifically, they alleged that "if

NAICO is entitled to recoup the sums it paid, its claim is against [Gulsby] because NAICO performed [Gulsby's] obligations to pay its subcontractors under the construction contracts and has an indemnity agreement from [Gulsby]." Essentially, Williams and Gulf Liquids argue that once a surety has paid on a bond, its remedy lies with the principal, and it has no right to an independent tort claim to recover those amounts. Gulf Liquids and Williams also argue that fraud and misrepresentations are defenses to a surety's liability, but do not give rise to an independent cause of action. We agree.

■ Fraud in the inducement of the underlying construction contract will serve as a defense to a surety's liability on the bonds. *See Taylor & Jennings, Inc. v. Bellino Bros. Const. Co.*, 57 A.D.2d 42, 42, 393 N.Y.S.2d 203, 205 (N.Y.App.Div.1977); 4A Bruner & O'Connor, supra, § 12:66 (2009). Similarly, fraud or misrepresentation by the obligee that induces the surety to issue the bond can result in the surety's obligation being voidable. Restatement (Third) Suretyship and Guaranty § 12 (1996); 4A Bruner & O'Connor, supra § 12:76. However, NAICO has cited no authority holding that such fraud will serve as an independent ground for a tort recovery for fraudulent inducement.

■ Regarding post-contractual misrepresentations about the $12 million change order, we note that if there is an alteration of a bonded contract that imposes materially different risks, the surety may be entitled to a discharge of its obligations under the bonds. *See U.S. v. Freel*, 186 U.S. 309, 317, 22 S.Ct. 875, 878, 46 L.Ed. 1177 (1902); *Old Colony Ins. Co.*

---

**5.** Regarding its post-contract fraud claims, NAICO contends that Gulf Liquids misrepresented or concealed (1) the fact that the actual cost of the project included a $12 million change order, and (2) that the project was mechanically complete when it requested payment on the bonds.

*v. City of Quitman,* 163 Tex. 144, 352 S.W.2d 452, 455 (1961). Regarding misrepresentations about substantial completion, we note that performance bonds are conditional obligations that are triggered by, among other requirements, the principal's material breach of the bonded contract sufficient to warrant termination. *See Beard Family P'ship v. Commercial Indem. Ins. Co.,* 116 S.W.3d 839, 845 (Tex. App.-Austin 2003, no pet.). If a contractor has substantially complied with a construction contract, it cannot be said to have materially breached the construction contract. *See Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 481 (Tex.1984); 4A BRUNER & O'CONNOR, supra, §§ 12:45, 5 BRUNER & O'CONNOR 18:12 2002 & Supp. 2010). Thus, in such a circumstance, the surety is not liable on the bonds. *See Kidd–Scruggs Co. v. Tyler Hotel Co.,* 270 S.W. 566, 570–71 (Tex.Civ. App.-Texarkana 1925, writ ref'd). NAICO contends that it relied to its detriment on Gulf Liquids's and Williams's misrepresentations because, "had [it] known that Gulf Liquids was not paying Gulsby monies it owed, NAICO could have declared an owner default before [it paid on the bonds]." However, an "owner default" is a defense to the surety's liability. 4A BRUNER & O'CONNOR, supra §§ 12:15, 12:69. Just as there is no authority that fraudulently inducing the issuance of a bond will serve as an independent ground for a tort recovery, there is no authority that fraudulently inducing one to forgo a contract defense will serve as an independent ground for a tort recovery. Instead, NAICO cites several cases allowing a surety to bring a profes-

sional negligence claim against an engineer hired by the owner to oversee construction, an accountant hired by the contractor to prepare a financial statement, and a bank hired by the contractor to disburse contract funds.[6] However, in each of these cases, the duty breached arose out of a contract that the engineer, accountant, or bank had with either the owner or contractor, and the courts held that, even though not in privity, the sureties could maintain a negligence cause of action for the breach of those contractual duties. We note that in the case against the accountant, the duty was based on section 552 of the RESTATEMENT (SECOND) OF TORTS (1976), which, in certain circumstances, allows third parties to sue professionals for negligence despite a lack of privity if the professional has reason to know to know that a nonparty to its contract will rely on its information. *See Amwest Surety,* 677 So.2d at 411–12. And, in the case against the bank, the duty was based on a particular provision of California statutory law. *See Commercial Standard Ins.,* 129 Cal.Rptr. at 95–96. We are not persuaded that these cases stand for the general proposition that a surety may, under the circumstances present in this case, seek an independent tort recovery for damages incurred by paying on the bonds.

We are not holding that a surety who pays under a contract has no recourse to recoup its expenditures under the bonds. Indeed, the law of equity provides at least three possible remedies.[7] First, the "[c]ourts have long recognized that a sure-

6. *See Calandro Dev't, Inc. v. R.M. Butler Contrs., Inc.,* 249 So.2d 254, 265 (La.Ct.App. 1971) (engineer); *Amwest Surety Ins. Co. v. Ernst & Young,* 677 So.2d 409, 411–12 (Fla. Dist.Ct.App.1996) (accountant); *Commercial Standard Ins. Co. v. Bank of Am.,* 57 Cal. App.3d 241, 129 Cal.Rptr. 91, 94–96 (1976) (bank).

7. We do not decide which remedy is available in this case, we merely note their existence to show that sureties, like NAICO, are not left without a remedy when they pay bonds and it is later determined that the principal was not in breach of the underlying contract.

ty has an equitable right to reimbursement from the principal for amounts paid on an indemnity bond." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 281 n. 2 (Tex.1998); 4A BRUNER & O'CONNOR, supra, § 12.99 (2009). Second, to the extent that reimbursement is not available because, as here, the principal is not in fact liable, restitution may be available. RESTATEMENT (THIRD) SURETYSHIP & GUARANTY § 26 (1996); 4A BRUNER & O'CONNOR, supra, § 12.99 (2009) ("Even where the contractor has a valid defense to reimbursement of the surety for incurrence of unreasonable costs [because the surety paid what was not owed], the surety is still entitled to recover from the contractor, under the principle of restitution, for the reasonable value of benefits conferred on the contractor by the surety's incurrence of such costs."). Finally, under principles of equitable subrogation, a surety may be able to assert its principal's contract, tort, or statutory claims against the obligee arising out of the bonded contract. *See* RESTATEMENT (THIRD) SURETYSHIP & GUARANTY, §§ 27–28; 4A BRUNER & O'CONNOR, supra, § 12.100 (2009).

We also note that, in addition to these three possible equitable remedies, the parties may contractually provide for indemnification. Because many jurisdictions require sureties to prove that the principal was in fact liable before recovering reimbursement, sureties were reluctant to settle claims with the obligee until the principal's liability was determined. *Associated. Indem. Corp.*, 964 S.W.2d at 281 n. 2. To prevent the risk that reimbursement would not be available in the event that the surety paid and its principal was later determined not to be in default, many sureties obtained indemnity agreements with their principals, "under which the surety may obtain reimbursement for settlement amounts paid in good faith, regardless of whether the principal is ultimately deter-

mined to be liable to the obligee." *Id.* In fact, in this case, there is such an indemnity agreement between NAICO and Gulsby, wherein Gulsby states that its liability to NAICO "shall extend to and include all amounts paid by surety in good faith under the belief that (1) surety was or might be liable therefore; (2) such payments were necessary or advisable to protect any of surety's rights or to avoid or lessen surety's liability or alleged liability." Thus, NAICO has a contractual right to recover its expenditures from Gulsby to the extent that those amounts were paid in good faith belief that they were owed. As noted by the supreme court in *Associated Indem. Corp. v. CAT Contracting*, this practice promotes the practice of settling claims against the bonds without the necessity for litigation to first determine the principal's liability. *See id.*

In light of the contractual and equitable remedies available to NAICO, and the lack of clear authority permitting the type of tort suits alleged in this case, we hold that the trial court did not err by disregarding the jury findings on NAICO's tort claims.

We overrule issues one through four.

### C. Breach of Contract

In jury question 44, the jury found that Gulf Liquids materially altered Contracts 1 and 2 and that NAICO did not consent to the alteration. In jury questions 46 and 47, the jury found that Gulf Liquids committed an "owner default" of the contract that was not excused. Based on these questions, the jury found that NAICO had been damaged in the amount of $20,182,498.53. Nevertheless, the trial court granted JNOV, disregarded these findings, and rendered judgment that NAICO take nothing on these breach-of-contract claims. In issues five and six,

NAICO contends the trial court erred in disregarding these findings.

 Gulf Liquids responds that it did not breach the bonds, and that "the bonds at most provided NAICO with a defense to its obligations to Gulf Liquids." We agree. It is true that an "owner default" by nonpayment is a defense to the surety's liability. *See Roel P'ship v. Amwest Sur. Ins. Co.*, 258 A.D.2d, 780, 781–82, 685 N.Y.S.2d 832, (N.Y.App.Div.1999) (holding owner's default for failing to pay contractor according to the contract is defense to surety's liability); 4A BRUNER & O'CONNOR, *supra* §§ 12:15, 12:59, 12:72. Likewise, "a material alteration" is a defense to the surety's liability. *See Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464–65 (Tex.1991); 4A BRUNER & O'CONNOR, § 12:70. However, again NAICO cites no cases holding that either an "owner default" or a "material alteration" will support a direct claim for damages against the owner by the surety.

In light of the contractual and equitable remedies available to NAICO, and the lack of clear authority permitting a surety to assert a direct claim for damages against the owner as a result of an "owner default" or "material alteration," we hold that the trial court did not err by disregarding the jury damage awards in jury questions 48 and 49 on NAICO's breach of contract claims.

We overrule issues five and six.

### D. Declaratory Judgment

 In issue seven, NAICO argues that the trial court erred by disregarding jury question 46, in which the jury found that Gulf Liquids committed an "owner default." Specifically, NAICO argues that the existence of an "owner default" was established by the jury's finding in question 27a that Gulf Liquids had breached Contracts 1 & 2. We agree. The bonds defined an "owner default" as a "[f]ailure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract...." We have already held that Gulf Liquids breached the contracts by failing to pay Gulsby, thus an "owner default" has been established.

Even though we have held that NAICO cannot affirmatively recover damages based on a jury finding that Gulf Liquids committed an "owner default," it can assert the "owner default" finding as a defense to its liability. NAICO also requested a declaratory judgment that its obligations on the bond were discharged because of an "owner's default." Jury findings 27a (regarding Gulf Liquids's breach of contract to pay) and 44 (regarding "owner default") support NAICO's claim for a declaratory judgment. Therefore, we sustain NAICO's seventh issue. We reverse the judgment denying NAICO's request for a declaratory judgment, and render judgment declaring that NAICO's liability on the bonds is discharged because of an "owner's default."

### E. Punitive–Damage Awards

In issue eight, NAICO contends the trial court erred disregarding the jury's punitive-damage findings and setting aside the punitive-damage awards against Gulf Liquids and Williams. Because we have held that these parties committed no underlying tort, the trial court properly disregarded the punitive-damages awards. *See Schlueter*, 975 S.W.2d at 589; *Fed. Express Corp.*, 846 S.W.2d at 284 (holding recovery of punitive damages requires finding of independent tort with accompanying actual damages).

Accordingly, we overrule issue eight.

### F. Attorney's Fees

In its ninth issue, NAICO, like Gulsby, contends the trial court erred in awarding $0 in attorney's fees on its declaratory judgment claim based on NAICO's failure to segregate its fees in its declaratory judgment and breach-of-contract claims and from its fraud and tortious interference claims.

The remedy for unsegregated attorney's fees is a new trial on the issue, not rendition of a take-nothing judgment on the claim for attorney's fees. *See Tony Gullo Motors*, 212 S.W.3d at 310–11; *Stewart Title*, 822 S.W.2d at 11. "Unsegregated attorney's fees ... are some evidence of what the segregated amount should be." *Tony Gullo Motors*, 212 S.W.3d at 314. Because the testimony of the unsegregated amount constituted some evidence of the segregated attorneys' fees, we reverse the trial court's take-nothing judgment on NAICO's attorneys' fees claims and remand for further proceedings.

We sustain NAICO's ninth issue on appeal.

### DISPOSITIONS

### A. Conclusion Regarding Gulf Liquids's Appeal

Having determined that the trial court erred in submitting benefit-of-the-bargain damages to the jury, we reverse the breach-of-contract award in Gulsby's favor and remand for further proceedings. *See* Tex.R.App. P. 44.1(b). Having determined that the trial court erred by submitting quantum meruit claims to the jury because they were covered by the contracts, we reverse the quantum meruit award and render judgment that Gulsby take nothing on its quantum meruit claims.

### B. Conclusion Regarding Gulsby's Appeal

We affirm the trial court's granting of JNOV, disregarding of the jury's tort findings, and rendering judgment that Gulsby take nothing on its tort claims against Gulf Liquids and Williams. We also hold that, error, if any, in refusing to permit Jerry Gulsby to testify about Gulsby's value before the contracts were signed, was harmless. Finally, we hold that the trial court erred in awarding Gulsby $0 in attorney's fees on its breach-of-contract claim. In light of these holdings, we affirm the take-nothing judgment for Gulsby on its tort claims and reverse and remand its attorney's fees claims for further proceedings.

### C. Conclusion Regarding NAICO's Appeal

We affirm the trial court's granting of JNOV, disregarding of the jury's tort findings, and rendering judgment that NAICO take nothing on its tort claims against Gulf Liquids and Williams. We reverse the judgment denying NAICO's request for declaratory relief, and render judgment declaring that NAICO is discharged from its obligations on the bonds. We reverse the trial court's judgment awarding NAICO $0 in attorney's fees and remand its attorney's fees claim for further proceedings.